FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 1 3 2025

TAMMY H. DOWNS, CLERK

By: _____
DEP CLERK

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**ARKANSAS CRYPTOMINING ASSOCIATION,**
**on behalf of its members**                                    **PLAINTIFF**

v.                                    CASE NO.: *4:25cv234-BSM*

**LAWRENCE BENGAL, in his official capacity as the**        **DEFENDANTS**
**Director of the Arkansas Oil and Gas Commission;**
**TIM GRIFFIN in his official capacity as the**
**Attorney General of Arkansas; and**
**STATE OF ARKANSAS**

This case assigned to District Judge *Miller*
and to Magistrate Judge *Moore*

## COMPLAINT

Plaintiff Arkansas Cryptomining Association (the "Association"), on behalf of its members, brings this complaint against defendants Lawrence Bengal, in his official capacity as the Director of the Arkansas Oil and Gas Commission, Tim Griffin, in his official capacity as the Attorney General of Arkansas, and the State of Arkansas ("Defendants").

### I.    INTRODUCTION

1.    This action seeks injunctive and declaratory relief against Defendants' imminently threatened enforcement of unconstitutional regulations, collectively known as Rule K, which were promulgated under an unconstitutional statute, Act 174 of 2024 ("Act 174").

2.    Rule K and Act 174 are unconstitutional on their face.

3.    Rule K and Act 174 discriminate based on race, alienage, and national origin in violation of the rights to equal protection of the members of the Association.

4.    Rule K and Act 174 violate the right to due process of law held by the members of the Association.

5.    Rule K and Act 174 facially discriminate against out-of-state and foreign commerce for the impermissible purpose of favoring in-state commerce in violation of the Commerce Clause.

6.      Rule K and Act 174 invite and outsource enforcement efforts to be undertaken in the absence of reasonable suspicion and based on the perceived race, alienage, and national origin of digital asset mining companies already operating in Arkansas and impose heightened requirements that discriminate based on the perceived race, alienage, and national origin of digital asset mining companies on digital asset mining companies wishing to commence operations in Arkansas.

7.      Rule K and Act 174 are preempted by federal law.

8.      Rule K and Act 174 threaten takings of private property belonging to members of the Association without just compensation.

9.      This action is a facial challenge to Rule K and Act 174, which should each be declared unconstitutional and preliminarily and permanently enjoined.

## II.      JURISDICTION, VENUE, AND PARTIES

10.      This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because the claims arise under the Constitution, laws, or treaties of the United States and seek to redress the deprivation under color of law of rights secured by the Constitution of the United States.

11.      Venue is proper in this Court under 28 U.S.C. § 1391(b).

12.      This action is directly related to a civil action currently pending in this judicial district, *Jones Eagle LLC v. Ward et al.*, E.D. Ark. Case No. 4:24-CV-990, which involves common questions of law and fact and parties.

13.      The Association is a nonprofit corporation organized under Arkansas law. The Association's members are small businesses that own or operate digital asset mining facilities in Arkansas. Its members include digital asset mining companies which currently operate lawful

2

business operations at digital asset mining facilities in Arkansas and which wish to commence operations at future digital asset mining facilities.

14. The Association's purposes are to improve business conditions for and promote the digital asset mining industry in Arkansas and to oppose and prevent discriminatory industry-specific taxes, regulations, and other public policy that will stifle the growth of a burgeoning industry in Arkansas.

15. Operative facts concerning the Association's membership and purposes are set forth in the declaration of the Association's director ("Kempton Declaration"), which is attached hereto as Exhibit 1.

16. If enforcement efforts under Rule K and 174 are not enjoined, then the Association's members will be harmed by unconstitutional and discriminatory industry-specific taxes and regulations, including unconstitutional permitting regulations under Rule K, which purports to apply to digital asset mining companies which began operations before enactment of Act 174 and promulgation of Rule K.

17. Enforcement of Rule K and Act 174 will cause irreparable harm to each of the Association's members.

18. The Arkansas Oil and Gas Commission ("Commission") was created by Act 105 of 1939, which is now codified at Ark. Code Ann. §§ 15-71-101, *et seq.*

19. Lawrence Bengal ("Director Bengal") is a natural person and citizen of Arkansas and is sued in his official capacity as Director of the Arkansas Oil and Gas Commission ("Commission"). Director Bengal is the chief executive officer of the Commission and exercises superintending authority over the activities of its agents, designees, employees, and representatives, including their conduct relating to Rule K and Act 174.

3

20.     Tim Griffin ("Attorney General Griffin") is a natural person and citizen of Arkansas and is sued in his official capacity as the Attorney General of Arkansas. Attorney General Griffin exercises superintending authority over the activities of his agents, designees, employees, and representatives, including their conduct relating to Rule K and Act 174.

21.     Under Ark. Code Ann. § 15-71-104(a)(2), the Attorney General may act as attorney for the Commission in the absence of another contract for legal representation.

22.     Upon information and belief, the Attorney General has acted as attorney for the Commission regarding its promulgation of Rule K and compliance with operative court orders.

23.     The State of Arkansas is a constituent political subdivision of the United States of America.

24.     On behalf of its members, the Association brings federal claims for prospective injunctive relief and declaratory judgment against all Defendants under U.S. Const., amend. V and XIV; Fed. R. Civ. P. 57; 28 U.S.C. §§ 2201 and 2202; 42 U.S.C. §§ 1981 and 1983; and *Ex parte Young*, 209 U.S. 123 (1908).

25.     On behalf of its members, the Association brings takings claims for injunctive relief and damages against the State of Arkansas, which lacks sovereign immunity applicable to claims for just compensation arising directly under the Fifth and Fourteenth Amendments to the Constitution of the United States in the absence of an adequate and available state cause of action. *DeVillier v. Texas*, 601 U.S. 285 (2024).

### III.     BACKGROUND

26.     In May 1882, the United States passed the Chinese Exclusion Act, which banned all Chinese laborers from immigrating to the United States. The Chinese Exclusion Act was the first and only major U.S. law ever implemented to prevent all members of a specific racial group

from immigrating to the United States. The law remained in force until 1943, when China became a wartime ally of the United States against Japan.

27.    But Arkansas chose a different path. The Arkansas Constitution provides that "[n]o distinction shall ever be made by law, between resident aliens and citizens, in regard to the possession, enjoyment or descent of property." Ark. Const. Art. 2, § 20.

28.    As the Arkansas Constitution makes clear, Arkansas law affords no compelling state interest to discriminate based on race, alienage, or national origin with respect to property rights.

29.    In 1927, the Arkansas Supreme Court applied the Arkansas Constitution to strike down a state law called Act 249 of 1925, known as the "Alien Land Act." *Applegate v. Lum Jung Luke*, 173 Ark. 93, 291 S.W. 978 (1927).

30.    The Arkansas Alien Land Act attempted to prohibit certain aliens from acquiring, possessing, enjoying, using, cultivating, occupying, or transferring certain property interests. *Id.* at 979.

31.    The Arkansas Supreme Court struck down the Arkansas Alien Land Act by applying Ark. Const. Art. 2, § 20. *Id.* at 979 ("The manifest and only intent which can be extracted from the language is that all resident aliens in Arkansas, whether eligible to naturalization and citizenship under the laws of the United States, have the same right to acquire and enjoy the possession of property in this state, either by purchase or descent, that any natural citizen has.").

32.    However, equal justice under law has not always been enjoyed by Asian-Americans in Arkansas.

33.    During World War II, the United States War Relocation Authority established two internment camps in Arkansas: Jerome and Rohwer.

34.    In *Korematsu v. United States*, the Supreme Court found that certain wartime powers of the ***federal*** government allowed Congress and the President "to exclude those of Japanese ancestry from the West Coast war area at the time they did." 323 U.S. 214, 217 (1944).

35.    However, in 1948, the U.S. Supreme Court held that the 14th Amendment rights of Fred Oyama, a U.S. citizen and the son of Japanese immigrants, had been violated when the State of California moved to repossess land purchased by Oyama's non-citizen father in Oyama's name while the family was incarcerated in an internment camp. *Oyama v. California*, 332 U.S. 633 (1948).

36.    As a result of the *Oyama* decision and other developments in equal protection case law, most of the country's Alien Land Laws were repealed or struck down in the 1950s.

37.    On August 10, 1988, President Reagan signed into law the Civil Liberties Act of 1988, which provided monetary restitution to surviving victims of Japanese-American internment camps during World War II. 50 U.S.C. §§ 4201, *et seq.*

38.    At the signing ceremony, President Reagan recalled, "America stands unique in the world—the only country not founded on race but on a way, on an ideal. Not in spite of, but because of our polyglot background, we have had all the strength in the world. That is the American way. And yes, the idea of liberty and justice for all, that is still the American way."

39.    In 2018, the Supreme Court expressly disavowed *Korematsu* to "make express what is already obvious: *Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history and—to be clear—'has no place in law under the Constitution.'" *Trump v. Hawaii*, 585 U.S. 667, 710 (2018) (quoting *Korematsu*, 323 U.S. at 248 (Jackson, J., dissenting)).

40.     Believing Arkansas to have a low-cost and pro-business environment, and induced by Act 851 of 2023, members of the Association have invested substantial capital, time, and energy in developing a new industry in Arkansas.

41.     Members of the Association comply with non-discriminatory legal requirements, pay their fair share in taxes, hire Arkansas contractors and employees, and are helping build a new industry bringing substantial capital investment and technical expertise to Arkansas.

42.     As to non-discriminatory legal requirements, the Association's members have complied "with every requisite deemed by the law, or by the public officers charged with its administration[.]" *Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886).

43.     But now, through government overreach, Defendants seek to interfere and stifle the development of that new and growing industry by imposing discriminatory and oppressive industry-specific regulations and taxes.

44.     Defendants have acted in concert with prolonged, pretextual investigations of digital asset mining companies which span multiple agencies and instrumentalities of state government, and which have arisen under facially discriminatory statutory and regulatory regimes, including Rule K and Act 174.

45.     Defendants have acted in concert to evade or ignore federal court orders enjoining enforcement of Act 174 as against one of the Association's members: Jones Eagle, LLC.

46.     In response to issuance of a temporary restraining order and a preliminary injunction enjoining enforcement efforts under Act 174 of 2024, the Commission expedited its efforts to promulgate Rule K, despite having actual knowledge that the statutory authority for Rule K was subject to a federal preliminary injunction order.

47.     Rule K imposes unconstitutional and discriminatory industry-specific taxes and regulations on digital asset mining companies, including all the Association's members.

48.     On behalf of its members, the Association requests that the Court enter judgment declaring that Rule K and Act 174 violate the U.S. Constitution and federal statutory law, both on their face and as applied to the Association's members, and an injunction to restrain Defendants from efforts to enforce these discriminatory and unconstitutional laws against the Association, its members, and all persons subject to any requirements imposed thereunder.

49.     On behalf of its members, the Association requests that the Court issue an order to compel obedience to its existing preliminary injunction order by all agencies, instrumentalities, and personnel of the State of Arkansas, including but not limited to the nominal parties in this action.

50.     Broader, facial relief is necessary in the light of the evident inadequacy of as-applied relief to remedy ongoing deprivations under color of law of rights secured by the Constitution of the United States.

**A.     The legislative history of Act 174 of 2024**

51.     On April 18, 2024, the Arkansas Senate City, County – Local Affairs Committee first considered SB 78 and SB 79, which were sponsored by Arkansas State Senators Josh Bryant and Missy Irvin, respectively.

52.     During their comments at the committee hearing, Senators Bryant and Irvin repeatedly emphasized the prohibition on "foreign ownership" to be imposed by SB 78 and SB 79.

53.     During the legislative process, multiple state senators and witnesses, including local public officials, asserted that digital asset mining businesses operating in Arkansas were controlled in whole or in part by the government of the People's Republic of China.

8

54.     The Arkansas Senate City, County – Local Affairs Committee passed SB 78 and SB 79 by voice vote to be submitted for consideration on the floor of the Arkansas Senate.

55.     On April 24, 2024, SB 78 and SB 79 were submitted to the full Arkansas Senate after certain minor amendments.

56.     Legislative discussion on SB 78 and SB 79 focused specifically on China.

57.     Discussing SB 78 before the full Senate, Senator Bryant stated, "The last piece deals with foreign ownership. I think a commonality of the industry that is not playing well in Arkansas is the fact that they are not Arkansas-owned or American-owned."

58.     Senator Bryant stated, "[t]hose that do not, we're going to ask them to leave our state and that includes all foreign-adversarially-owned facilities and business models for this crypto-mining industry."

59.     Senator Bryant continued, "On these particular examples, if they're foreign-owned, they'll have to divest to become American-owned at least and hopefully Arkansan-owned."

60.     In directing a question to Senator Bryant on the Senate floor, Arkansas State Senator Bryan King stated, "I mean, to me it's almost like, on this foreign ownership, ten months after Pearl Harbor, well we may need to look into the Japanese Navy."

61.     Senator King stated, "Harrison was Pearl Harbored," in reference to a proposed digital asset mining facility that was intended to be constructed in Harrison, Arkansas.

62.     In a statement upon passage, Senator Bryant stated the purpose of the bill was to "ensuring foreign adversaries like China do not operate in our state." Snyder, Josh, *Arkansas Democrat-Gazette*, May 1, 2024, https://www.arkansasonline.com/news/2024/may/01/crypto-mining-bills-sail-through-house-on-way-to/.

63.     Advocating for SB 78, Representative Stephen Meeks stated, "These foreign actors who want to come in – they want to disrespect our citizens, disrespect our resources, with the passage of this bill we tell them it's time to leave and go somewhere else." *Id.*

64.     On or about May 1, 2024, a spokesperson for Governor Sanders stated, "The Governor was the first in the country to kick a Chinese communist owned company out of her state and strongly supports outlawing foreign adversaries from owning crypto mines in Arkansas[.]" Crypto Mining Bills Sail through House on Way to Sanders for Signature. *Id.*

65.     In specific reference to the International Traffic in Arms Regulations ("ITAR"), Senator Missy Irvin said, "[t]here's a reason why they're on that list." *Id.*

66.     When asked whether a party operating in Arkansas would be forced to divest if its country subsequently becomes a prohibited foreign party as listed by ITAR, Senator Bryant responded that he did "not know the answer to that today." *Id.*

**B.     The text of Act 174**

67.     On or about May 3, 2024, the Arkansas General Assembly passed Act 174 of 2024 ("Act 174"), which effectuated amendments to Act 851 of 2023, known as the Arkansas Data Centers Act of 2023 ("Act 851").

68.     Act 174 repealed Ark. Code Ann. § 14-1-602(b)(2), which had previously codified the Arkansas General Assembly's intent "to protect data asset miners from discriminatory industry-specific regulations and taxes."

69.     Thus, the specific intent of Act 174 was to impose "discriminatory industry-specific regulations and taxes" on the digital asset mining industry.

70.     Act 174 created a new code section, 14-1-606, which is entitled "Ownership of digital asset mining business by prohibited foreign-party-controlled business prohibited—Definitions—Penalty—Reporting." Ark. Code Ann. § 14-1-606.

71.     Act 174 defines "interest" as "an ownership interest of greater than zero percent (0%)." Ark. Code Ann. § 14-1-606(a)(1).

72.     Act 174 prohibits *any* interest in a "digital asset mining business" being held by a "prohibited foreign party." Ark. Code Ann. § 14-1-606(a)(2).

73.     By virtue of ownership—even *de minimis* ownership—by a "prohibited foreign party," an otherwise lawful digital asset mining business is transformed into a "prohibited foreign-party-controlled business." *See id.*

74.     Ark. Code Ann. § 14-1-606 provides a four-part definition of "prohibited foreign party," which is in turn defined "subject to § 126.1 of the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. § 120.1 et seq., as existing on January 1, 2024."

75.     However, Act 174's definitions of "interest" and "foreign party" are inconsistent with the federal definitions under the ITAR.

76.     The Attorney General has essentially boundless discretion to "conduct an investigation" under Act 174, provided that "a person" makes a "request" or "upon receipt of information that leads the Attorney General to believe that a violation of this section may exist[.]" Ark. Code Ann. § 14-1-606.

77.     Act 174 purports to give the Attorney General the power to "order" a "prohibited foreign party to divest all interest in the digital asset mining business." Ark. Code Ann. § 14-1-606(e)(1).

78.     If the prohibited foreign party "fails to divest all interest in the digital asset mining business within three hundred sixty five (365) calendar days," then the Attorney General has a right of action to seek judicial foreclosure.

79.     Proceeds of such a judicial foreclosure "shall be disbursed to the lienholders, in order of priority, except for liens that under the terms of the sale are to remain." Ark. Code Ann. § 14-1-606(e)(3)(B).

80.     Act 174 makes no provision for any compensation to a "prohibited foreign party" whose property is actually taken by the government and sold by forced judicial foreclosure.

81.     Act 174 also purports to confer broad rulemaking and enforcement powers to the Arkansas Oil and Gas Commission ("Commission").

## C.     General statutory authorities of the Commission

82.     Ark. Code Ann. § 15-71-110 establishes the general powers and duties of the Commission.

83.     Ark. Code Ann. § 15-17-110(a) provides that "The Oil and Gas Commission shall have jurisdiction of and authority over all persons and property necessary to administer and enforce effectively the provisions of this act and all other statutory authority of the commission relating to the exploration, production, and conservation of oil and gas."

84.     Ark. Code Ann. § 15-17-110(c) authorizes the Commission to "make inquiries as it deems proper to determine whether or not waste over which it has jurisdiction exists or is imminent."

85.     Ark. Code Ann. § 15-71-110(d) authorizes the Commission to promulgate "reasonable rules and orders as are necessary from time to time in the proper administration and enforcement of this act," including specific authorization to make rules regarding "drilling, casing, operation, and plugging of wells."

86.     However, the general statutory authority of the Commission set forth in Ark. Code Ann. § 15-71-110 does not extend in any respect to regulation of the digital asset mining industry.

**D.    Act 174's provision of specific rulemaking authority to the Commission**

87.    Act 174 created a new chapter of Arkansas Code intended to impose discriminatory industry-specific regulations and enforcement regimes to be promulgated by the Commission. *See* Ark. Code Ann. §§ 23-119-101, *et seq.*

88.    Among its stated purposes, Act 174 intended to "[p]rovide for the powers and duties of the Oil and Gas Commission relating to the permitting and regulation of digital asset mining business;" and to "prescribe penalties for violations of this chapter." Ark. Code Ann. §§ 23-119-101(c)(2)-(3).

89.    Ark. Code Ann. § 23-119-102 provides statutory definitions "[a]s used in this chapter."

90.    Ark. Code Ann. § 23-119-102(1) defines "blockchain network" as "a group of computers operating and processing together to execute a consensus mechanism to agree upon and verify data in a digital record for the purpose of generating digital assets."

91.    Ark. Code Ann. § 23-119-102(2) defines "digital assets" as "cryptocurrency, virtual currency, and natively electronic assets, including without limitation stable coins, nonfungible tokens, and other digital-only assets, that confer economic rights or powers."

92.    Ark. Code Ann. § 23-119-102(3) defines "digital asset mining business" as "a group of computers working at a single site that consumes more than one megawatt (1 MW) of electrical energy on an average annual basis for the purpose of generating digital assets by securing a blockchain network."

93.    Ark. Code Ann. § 23-119-103(a) provides that "[a] digital asset mining business shall not operate in Arkansas without a valid permit from the Oil and Gas Commission under this chapter."

13

94.     Ark. Code Ann. § 23-119-103(b) provides that "the commission shall establish the application for a permit for a digital asset mining business to operate."

95.     Ark. Code Ann. § 23-119-103(c) provides that "[t]he issuance of a digital asset mining business permit shall be contingent upon compliance with all applicable state laws, including without limitation the Arkansas Data Centers Act of 2023, § 14-1-601 et seq."

96.     Act 174 created a new code section, 23-119-104, which is entitled "Rules."

97.     That section provides, "The Oil and Gas Commission shall promulgate rules to implement this chapter, including without limitation rules establishing requirements for: (1) Permitting; (2) Application for a permit; (3) Renewal of a permit; (4) The requirements and terms for a permit; and (5) The establishment and operation of a digital asset mining business." Ark. Code Ann. § 23-119-104.

98.     Act 174 created a new code section, 23-119-105, which is entitled "Enforcement."

99.     Ark. Code Ann. § 23-119-105(a) purports to confer to the Commission "jurisdiction of and authority over all persons and property necessary to administer and enforce effectively: (1) this chapter; and (2) the Arkansas Data Centers Act of 2023, § 14-1-601 et seq."

100.    Ark. Code Ann. § 23-119-105(b) purports to confer authority upon the Commission to "mak[e] reasonable investigations and inspections; examin[e] properties, leases, papers, books, and records; hold[] hearings; require[] the keeping of records and the making of reports; and tak[e] such action as may be reasonably necessary to enforce this chapter."

101.    Ark. Code Ann. § 23-119-105(c) purports to confer authority upon the Commission to "make, after hearing and notice, such reasonable orders as necessary from time to time in the proper administration and enforcement of this chapter and the Arkansas Data Centers Act of 2023, § 14-1-601 et seq."

102.    Ark. Code Ann. § 23-119-105(d)(1) authorizes "[a]n individual or legal entity" to "file a complaint with the commission relating to the compliance of digital asset mining businesses with state law, the requirements and terms of a permit, or the rules of the commission," but contains no requirement that such an individual or legal entity must establish any actual standing to bring such a "complaint."

103.    Upon receiving a complaint, the Commission may "investigate the complaint; and assess penalties in response to any identified noncompliance." Ark. Code Ann. § 23-119-105(d)(2).

104.    Ark. Code Ann. § 23-119-105(e) directs the Commission to "promulgate rules establishing: (1) The procedures for ensuring compliance with state law, the requirements and terms of a permit, and rules of the commission; and (2) Penalties for failure to comply with state law, the requirements and terms of a permit, or rules of the commission, including without limitation: (i) Financial penalties; and (ii) The suspension or revocation of a permit issued under this subchapter."

105.    At the time it was engrossed, Act 174 contained a section entitled "SECTION 7. DO NOT CODIFY. TEMPORARY LANGUAGE. APPLICATION FOR INITIAL PERMITS."

106.    Section 7 of Act 174 purports to establish application procedures for existing digital asset mining companies, though the text of the statute provides that it is not actually codified.

107.    To the extent Section 7 is not actually codified, then it has no legal effect and could impose no mandatory standards of conduct upon existing digital asset mining companies as a matter of law. Ark. Const. art. 6, § 15; *see State ex rel. Hebert v. Hall*, 228 Ark. 500, 308 S.W.2d 828 (1958); *Monroe v. Green*, 71 Ark. 527, 76 S.W. 119 (1903).

108.    Section 7's subsection (a) provides, "[w]ithin ninety (90) days of the effective date of the initial rules promulgated under § 23-119-104, an individual or legal entity operating one (1)

or more digital mining asset businesses in Arkansas shall apply for a permit for each digital asset mining business operated by the individual or legal entity in Arkansas."

109.    Section 7's subsection (b) provides, "[t]his act does not prohibit a digital asset mining business from operating (1) Before the effective date of the initial rules promulgated under § 23-119-104; (2) During the ninety-day period to apply for a permit under subsection (a) of this section; and (3) While the Oil and Gas Commission is considering the digital asset mining business's application for a permit."

110.    Section 7's subsection (c) provides, "A digital asset mining business shall cease operations if: (1) The digital asset mining business is operating on the effective date of the initial rules promulgated under § 23-119-104 and fails to apply for a permit in the ninety-day period to apply for a permit under subsection (a) of this section; or (2) The digital asset mining business's application for a permit under subsection (a) of this section is denied."

111.    Because Section 7 has no legal effect, it is not a "clear statement" of retroactivity and therefore confers no authority to the Commission to promulgate regulations to apply to digital asset mining companies which had established pre-existing vested property interests before enactment of Act 174 or promulgation of Rule K.

112.    Section 8 of Act 174 contains an "emergency clause," which meant Act 174 became immediately effective upon enactment.

**E.    The Commission's promulgation of Rule K**

113.    In approximately June 2024, the Commission began work to promulgate rules and regulations authorized under Act 174.

114.    By the end of September 2024, the Commission completed its first draft of those regulations which would become "Rule K."

115.    At 11:14 a.m. on September 27, 2024, the Commission sent a draft set of rules to legal counsel of the Arkansas Governor's Office in an email entitled "OGC Rule K – Digital Asset Mining – Request for Approval."

116.    That correspondence included a document entitled "Proposed Promulgation of OGC General Rule K: Rules Regulating Digital Asset Mining Business and Data Centers," which was dated September 27, 2024.

117.    In that document attachment the Commission emphasized, "[t]he acts themselves prevented foreign ownership of these enterprises, and created a regulatory structure that includes the delegation of permitting and enforcement powers to the Oil and Gas Commission."

118.    The Commission stated, "Rule K is necessary to fully execute the policy created in Acts 173 and 174," and that "[t]he rules are necessary to comply with the legislative mandates."

119.    The Commission stated, "E&E seeks the Governor's approval of its promulgation of Oil and Gas Commission Rule K: Digital Asset Mining Business Requirements. As explained in the attached packet, this promulgation is pursuant to Acts 173 and 174 of the 2024 Fiscal Session."

120.    The recipients of that email correspondence of September 27, 2024, were Cole Jester and Rachel Smith, legal counsel of the Arkansas Governor's Office, and Peter Alberg and Lauren Ballard, legal counsel of the Arkansas Department of Energy and Environment.

121.    On October 27, 2024, the *Arkansas Democrat-Gazette* reported that the rulemaking process was directly overseen by the Arkansas Governor's Office. Draft of Proposed Arkansas Crypto Mine Rules Awaits Governor's Approval, then Public Comments, Platt, Ainsley, *Arkansas Democrat-Gazette*,          Oct.          27,          2024,          *available*          *at*

*https://www.arkansasonline.com/news/2024/oct/27/draft-of-proposed-arkansas-crypto-mine-rules/.*

122.    From the beginning, the primary purpose of Rule K was to target persons believed to be Chinese nationals or with Chinese ancestry.

123.    As reported on October 27, 2024, Sam Dubke, a spokesman for the Arkansas Governor wrote, "Governor Sanders was the first governor in the country to kick a Communist Chinese-owned company out of her state and strongly supports outlawing foreign adversaries from owning crypto mines in Arkansas while protecting rural communities and empowering them to crack down on bad actors." *Id.*

124.    The legislative sponsor of Act 174, Sen. Bryant, was quoted as saying, "*the draft even goes a bit further than what is explicitly outlined in the 2024 changes* requiring permit applicants to provide certain documentation with their applications, such as agreements that certify that the crypto mine's energy use won't raise utility costs or negatively impact the electrical grid." *Id.* (emphasis added).

125.    The Arkansas Blockchain Council's president Ben Smith reportedly "distanced the council from the mining operated by Chinese companies, saying that while the council was aware of them, their interests were not the same." *Id.*

126.    At 10:40 a.m. on October 29, 2024, the Commission's lawyer, Kesia Morrison, forwarded a second email to Jester, Smith, Alberg, and Ballard, stating, "[p]er our conversation, attached please find markup and clean copies of Rule K as recently revised."

127.    At 12:59 p.m. on November 4, 2024, Morrison replied to that earlier email, stating, "Cole and Rachel, [a]ttached please find a revised draft of Rule K that addresses statutory concerns that were recently raised. This reflects the substantive changes we plan to make, subject to any

technical revisions that may be necessary to accommodate these changes. Please let us know if you have any questions or concerns."

128.    At 12:42 p.m. on November 12, 2024, Morrison replied to an email to the same recipients, stating "Please allow this email to confirm that the Governor's Office has approved Rule K as revised."

129.    On November 13, 2024, one of the Association's members, Jones Eagle, LLC ("Jones Eagle"), filed a civil action challenging the constitutionality of Act 174 of 2024 in the U.S. District Court for the Eastern District of Arkansas. *See Jones Eagle LLC v. Ward et al.*, E.D. Ark. Case No. 4:24-CV-990, Dkt. No. 1.

130.    Jones Eagle's complaint sought a declaratory judgment that Act 174 violated the federal constitution and preliminary and permanent injunctive relief to enjoin its enforcement. *Id.*

131.    On November 19, 2024, Jones Eagle filed a motion for temporary restraining order and preliminary injunction to enjoin enforcement efforts under Act 174. *Id.* at Dkt. No. 7.

132.    On November 25, 2024, this Court granted the motion for temporary restraining order in favor of Jones Eagle, restraining all the defendants in that action, and *persons acting in concert with them*, from undertaking any efforts to enforce Act 174 as against Jones Eagle or its principal, Mr. Jimmy Chen. Fed. R. Civ. P. 65(d).

133.    At 8:38 a.m. on November 26, 2024, Lauren Ballard advised Director Bengal and the Department of Energy and Environment's ("Department") Secretary Shane Khoury of the fact of the temporary restraining order enjoining enforcement efforts under Act 174.

134.    Thus, by 8:38 a.m. on November 26, 2024, all Defendants in this action had actual notice that the Court's temporary restraining order enjoined their enforcement of Act 174,

including their efforts to promulgate rules under Act 174's statutory authority, as applied to a member of the Association.

135.    Six seconds later, Ballard notified Rachel Smith, an attorney at the Arkansas Governor's Office, of the very same temporary restraining order, advising "FYSA," meaning, upon information and belief, "for your situational awareness."

136.    Six hours later, at 2:42 p.m., Smith replied, "Thank you. We've been tracking!"

137.    Three minutes later, at 2:45 p.m. on November 26, 2024, Director Bengal wrote to Peter Alberg about the legal implications of the Court's temporary restraining order on the Commission's rulemaking process under Act 174.

138.    Director Bengal wrote, "*obviously* it may impact our rule, but I have no problem with the public notice going forward unless Shane and Lauren do." (emphasis added). Director Bengal's email specifically discussing the impact of the Court's temporary restraining order on the Commission's rulemaking process is attached as Exhibit 2.

139.    Thus, hours after learning of the Court's temporary restraining order, Director Bengal instructed the Commission to continue to promulgate Rule K despite actual notice that its statutory enabling authority, Act 174, had been enjoined by a federal court order.

140.    At 3:57 p.m. on December 2, 2024, the Commission's lawyer, Kesia Morrison, circulated a copy of the temporary restraining order which restrained enforcement efforts under Act 174 as against "all those acting in concert" with the party-defendants in that federal action.

141.    At 7:13 p.m. on December 2, 2024, Morrison circulated "key filings" from *Jones Eagle, LLC v. Ward et al.*, E.D. Ark. Case No. 4:24-CV-990 as well as a copy of Act 174 to legal counsel and other officials of the Commission and the Department.

142.    On December 4, 2024, the Court convened an evidentiary hearing in that action to consider the motion for preliminary injunction filed by the Association's member, Jones Eagle.

143.    On December 9, 2024, the Court entered a sealed preliminary injunction order that enjoined the party-defendants and those acting in concert with them from efforts to enforce Act 174 as applied to the Association's member, Jones Eagle. *See* Fed. R. Civ. P. 65(d).

144.    The Attorney General is a party-defendant in that action and is subject to the Court's preliminary injunction order.

145.    By December 10, 2024, all Defendants had received actual notice of the fact of the Court's preliminary injunction order.

146.    Yet the day after the issuance of the preliminary injunction order restraining enforcement under Act 174, the Commission voted to "begin" the rulemaking process for regulating digital asset mining companies under Rule K.

147.    On December 10, 2024, the *Arkansas Democrat-Gazette* reported that, before announcing the public comment process, the Commission had made changes to Rule K while acting directly in concert with the Arkansas Governor's Office. Arkansas Oil and Gas Commission Votes to Begin Rulemaking Process for Crypto Mining, Platt, Ainsley, *Arkansas Democrat-Gazette*, Dec. 10, 2024, *available at https://www.arkansasonline.com/news/2024/dec/10/arkansas-oil-and-gas-commission-votes-to-begin/.*

148.    On or about December 10, 2024, the Commission issued a Notice of Rule Change and Request for Public Comment pursuant to Ark. Code Ann. §§ 25-15-201, *et seq.*; 15-71-110; and 23-119-104.

149.     The Commission announced, "General Rule K has four (4) separate rules: K-1 'Applicability, General Provisions and Definitions', K-2 'Digital Asset Mining Business Permitting Requirements,' K-3 'Digital Asset Mining Business Permit Transfer Procedures,' and K-4 'Digital Asset Mining Business Enforcement Procedures.'"

150.     The Commission set a public hearing on January 6, 2025, to solicit comments on the rulemaking.

151.     The Commission solicited comments "of any interested party to the proposed rule by submitting comments in writing on or before the end of the public comment period," or January 13, 2025.

152.     On January 13, 2025, the Association submitted on behalf of its members written comments opposing numerous components of Rule K in accordance with the Commission's Notice of Rule Change and Request for Public Comment. A copy of those comments is attached hereto as Exhibit 3.

153.     Among other objections, the Association noted that Rules K-1(b)(3)(B) and K-2(c)(7) are preempted under federal law and unconstitutional. Ex. 3, at 13.

154.     Rule K-1(b)(3)(B) provides that, "A digital asset mining business may operate in Arkansas if the digital asset mining business […] [e]stablishes that the business is not a prohibited foreign-party-controlled business as defined by and in accordance with Ark. Code Ann. § 14-1-606."

155.     Rule K-2(c)(7) requires "[a] notarized affidavit certifying that the digital asset mining business operating the mining facility is not foreign owned and is in compliance with Ark. Code Ann. § 14-1-606."

156.    On January 28, 2025, the Commission convened a regularly scheduled hearing in Fort Smith, Arkansas where it considered revisions made to proposed Rule K based on public comments received.

157.    Despite having made further revisions to Rule K, the Commission gave no public notice of its consideration of Rule K at its hearing of January 28, 2025, and the Commission did not list consideration of Rule K on its public agenda.

158.    Following media coverage of the Commission's rules promulgation process, officials with the Department conferred with officials of the Arkansas Governor's Office to discuss steps to minimize circulation of the fact that Rule K had been approved at the Commission's hearing of January 28, 2025.

159.    On or about January 29, 2025, the Commission issued a Responsive Summary pursuant to Ark. Code Ann. § 25-15-204(g)(1)(C)(ii)(c). A copy of the Commission's Responsive Summary is attached as Exhibit 4.

160.    In response to the comments that Rule K-1(b)(3)(B) and Rule K-2(e)(7) were preempted under federal law and unconstitutional, the Commission stated, "AOGC acknowledges the comment but has determined that no changes to the rule are warranted." Ex. 4, at 19-20.

161.    Those determinations by the Commission conflict with the preliminary injunction order issued by this Court in *Jones Eagle, LLC v. Ward et al.*, E.D. Ark. Case No. 4:24-CV-990-KGB.

162.    That preliminary injunction enjoins Secretary of Agriculture Wes Ward, Attorney General Tim Griffin, "and all those acting in concert with them, from enforcing **any** provision of […] Act 174 against Jones Eagle until further Order from this Court." *Id.*, Dkt. No. 39, at 2 (emphasis added).

163.    "[T]he real party in interest in an official-capacity suit is the governmental entity and not the named official[.]" *Hafer v. Melo*, 502 U.S. 21, 25 (1991).

164.    Under Fed. R. Civ. P. 65(d)(2), a preliminary injunction order binds "the parties, the parties' officers, agents, servants, employees, and attorneys; and other persons who are active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)," provided those persons have "actual notice of it."

165.    The operative preliminary injunction order was issued in a civil action brought by the Association's member, Jones Eagle, against state officials in their official capacity, which is "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010); *see also Baker v. Chisom*, 501 F.3d 920, 925 (8th Cir. 2007) (affirming application of res judicata in second official-capacity suit regarding identical parties and claims).

166.    As state officers, the Attorney General (Ark. Const. art. 6, § 1) and the Secretary of Agriculture (Ark. Code Ann. § 25-38-202(b)(1)) are "functionally equivalent" to the State of Arkansas. *Veatch*, 627 F.3d at 1257. Thus, all state actors with actual notice of the preliminary injunction order are bound by it. Fed. R. Civ. P. 65(d)(2).

167.    "[A] decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control. In essence it is that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 14 (1945).

168.    All Defendants had actual notice of the Court's temporary restraining order and preliminary injunction within hours after their issuance.

169.    Director Bengal and the Commission have attempted to evade or avoid their duties to comply with the Court's temporary restraining order and preliminary injunction despite having actual notice of their obvious applicability to the Commission's rule-making process.

170.    On or about January 31, 2025, the Commission submitted its responsive summary of January 29, 2025, to the Arkansas General Assembly's Bureau of Legislative Research.

171.    In February 2025, the Commission filed Rule K with the Administrative Rule Review Subcommittee of the Joint Budget Committee of the Arkansas General Assembly ("Administrative Rule Subcommittee"), pursuant to Ark. Code Ann. §§ 10-3-309(e)(1) and 25-15-216(b)(2).

172.    On February 12, 2025, the Administrative Rule Subcommittee convened a public hearing at which designees of the Commission testified in support of approval of Rule K.

173.    Members of the Administrative Rule Subcommittee questioned deviations under Rule K from statutory provisions of Act 174 of 2024, noting that Rule K's imposition of a one-mile notification radius exceeded statutory regulatory authority of 2,000 feet.

174.    Speaking to enforcement measures under Rule K, the Commission's designees testified the Commission "would do whatever is necessary," and "that may require the business to cease operations."

175.    The Commission's designees testified the Commission "would have the authority to enforce penalties and other sanctions that could require the business to be shut down, yes."

176.    Without further public comment, the Administrative Rule Subcommittee passed Rule K by a voice vote at its hearing on February 12, 2025.

177.    On February 13, 2025, the Commission submitted the final version of Rule K to Arkansas Secretary of State Cole Jester pursuant to Ark. Code Ann. § 25-15-204(e)(1)(A). A copy of that submission is attached hereto as Exhibit 5.

178.    Earlier, in his capacity as legal counsel in the Arkansas Governor's Office, Secretary Jester directly coordinated the Commission's drafting and development of Rule K.

179.    As part of the Commission's submission to the Arkansas Secretary of State, Director Bengal signed a certification attesting that the Commission adopted Rule K in compliance with the Arkansas Administrative Procedures Act. However, Director Bengal's certification was dated February 11, 2025, the day before the Commission had sought or received approval from the Administrative Rule Subcommittee as required under Ark. Code Ann. §§ 10-3-309(e)(1) and 25-15-216(b)(2). *See* Ex. 4., at 1.

180.    Pursuant to Ark. Code Ann. § 25-15-204(g)(1)(A), Rule K became effective "ten (10) days after filing of the final rule with the Secretary of State."

181.    On February 13, 2025, the Arkansas Secretary of State codified the Commission's Rule K as Rule No. 118.03.24-005.

182.    Thus, Rule K became effective on or about February 24, 2025 (February 23, 2025, was a Sunday).

183.    On February 21, 2025, the Commission issued Form 42, entitled "Digital Asset Mining Facility Permit Application." A copy of Form 42 is attached hereto as Exhibit 6.

184.    Form 42 identifies certain citations for Rule K-1 pursuant to a citation to the Code of Arkansas Rules. *See* 15 CAR §§ 275-901 to 904.

185.   Form 42 is a required submission by any digital asset mining company, including digital asset mining companies which had already commenced operations before Rule K or Act 174 had come into existence.

186.   Form 42 requires that each permit applicant submit "a notarized application certifying that the digital asset mining business operating the mining facility is not a prohibited foreign-party-controlled business." Ex. 6, § D.5.

187.   Form 42 contains a section entitled "INSTRUCTIONS," which states "Form 42 is required for operating a digital asset mining business in accordance with 15 CAR § 275-901 thru 904 (Rule K-1)."

**F.      The Federal Government's primacy in foreign affairs, foreign investment, and national security**

188.   At the time of the Revolution, "the powers of external sovereignty passed from the Crown not to the colonies severally, but to the colonies in their collective and corporate capacity as the United States of America." *United States v. Curtis-Wright Export Corp.*, 299 U.S. 304, 316 (1936).

189.   "The United States has inherent power as sovereign to control and conduct relations with foreign nations." *United States v. Iowa¸* 126 F.4th 1334, 1345 (8th Cir. 2025) (citing *Curtiss-Wright*, 299 U.S. at 318).

190.   The federal government manages foreign affairs, foreign investment, and national security in the United States, including through two systematic federal regimes: (i) the Committee on Foreign Investment in the United States ("CFIUS"), which has been empowered to review foreign investment transactions, and (ii) the Office of Foreign Assets Control ("OFAC") within the U.S. Treasury Department, which administers and enforces economic regulations and trade sanctions.

191.    The U.S. State Department occupies the field of regulating the International Traffic in Arms Regulations ("ITAR"), based on Congressional statutory delegation to the President, consistent with the supremacy of federal power in the arena of national defense policy in exercise of "the powers of external sovereignty." *Curtis-Wright*, 299 U.S. at 316.

192.    Rule K and Act 174 intrude on fields occupied by Congress and the President in violation of the Supremacy Clause.

### i.    *History of CFIUS*

193.    CFIUS was established on May 7, 1975, by President Ford through an executive order. E.O. 11858, 40 F.R. 20263. CFIUS became the interagency body of the federal executive branch responsible for overseeing issues of national security with respect to direct foreign investment. CFIUS was directed to, *inter alia*, monitor trends and developments in foreign investment in the United States, prepare guidance for foreign governments and consult regarding prospective major foreign governmental investments in the United States, review foreign investments that could have major implications for the national security interests of the United States, and consider proposals for new legislation or regulations relating to foreign investment, as necessary.

194.    Later, Congress enacted the Exon-Florio amendment to the Defense Production Act, included in the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 5021, 102 Stat. 1107, 1425-26. It established a mechanism for the federal executive branch to engage in a retrospective review of foreign investments. On December 27, 1988, President Reagan delegated that power to CFIUS by executive order, empowering it to conduct reviews, undertake investigations, and make recommendations with respect to foreign investment data and policies.

E.O. 12661, 54 F.R. 779. By 1991, the U.S. Treasury Department promulgated federal regulations implementing the Exon-Florio amendment, which were codified at 31 C.F.R. §800.

195.    The next year, Congress amended the Exon-Florio provision with the Byrd Amendment to the National Defense Authorization Act for Fiscal Year 1993, Pub. L. No. 102-484, § 837, 106 Stat. 2315, 2463-65 (1992). The Byrd Amendment broadened CFIUS's duties to investigate certain foreign investments, particularly those in which the acquirer was controlled or acting on behalf of a foreign government, and those in which the acquisition would result in the control of a person engaged in interstate commerce within the United States that could affect national security.

196.    Eventually, Congress passed, and President Bush signed, the Foreign Investment and National Security Act of 2007 ("FINSA"), Pub. L. No. 110-49, 121 Stat. 246, giving Congress further oversight of CFIUS. FINSA expanded the national security prerogatives within CFIUS's purview and required CFIUS to engage in even greater scrutiny of foreign direct investments. It also concretized CFIUS's position as a permanent federal agency by codifying it and granting it statutory authority, including certifying to Congress that a transaction that had been reviewed had no unresolved national security issues and providing Congress with confidential briefings, as well as annual classified and unclassified reports.

197.    Most recently, Congress passed the Foreign Investment Risk Review Modernization Act of 2018 ("FIRRMA"), Pub. L. No. 115-232, §§ 1701-28, 132 Stat. 2174-2207, which President Trump signed into law. The impetus for FIRRMA was the concern by many members of Congress over Chinese companies' growing investment in the United States. In response, Congress significantly expanded CFIUS's authority to investigate and review foreign investments. Most notably, CFIUS was granted jurisdiction to review certain real estate

transactions by foreign persons, specifically, those in close proximity to a military installation, or to a U.S. government facility, or property sensitive to national security. Congress also empowered CFIUS to review changes in foreign investor rights regarding U.S. businesses, as well as transactions in which a foreign government has a direct or indirect substantial interest. FIRRMA further authorized CFIUS to designate some countries as "countries of special concern" based on CFIUS's assessment as to whether that country has demonstrated or declared a strategic goal of acquiring a type of critical technology or critical infrastructure that would affect U.S. national security interests. In that regard, FIRRMA also formalized CFIUS's use of risk-based assessments to determine whether certain transaction pose threats to national security.

198.   At the same time, Congress carefully calibrated CFIUS's regulation of real estate purchases. For example, Congress constrained the President's power to prohibit transactions by exempting those involving only "a single 'housing unit.'" 50 U.S.C. § 4565(a)(4)(C)(i); *see* 31 C.F.R. §§ 802.223 (defining term), 802.216 (includes "adjacent land" incidental to use as housing unit.). That exception reflects the marginal national security implications of such transactions. In addition, the federal process is individualized, with the government reviewing particular transactions and purchasers to assess whether they pose any national security threat. 50 U.S.C. § 4565(d)(4). Penalties are narrowly tailored. Criminal liability attaches only where a person has made a false statement to CFIUS. 31 C.F.R. § 802.901(a)-(c), (g).

199.   Similarly, Congress carefully calibrated CFIUS's review of business transactions. Congress confined CFIUS's review power only to "covered transactions," which include transactions which could result in "foreign control of any United States business" achieved by "merger, acquisition, or takeover;" or "any other investment" concerning "critical infrastructure,"

"critical technologies," or "sensitive personal data of United States citizens." 50 U.S.C. § 4565(a)(4)(B).

### ii.    History of OFAC

200.    In addition to the CFIUS regime, the Treasury Department, through OFAC, is heavily involved with administering and enforcing economic and trade sanctions in support of U.S. national security and foreign policy objectives, including those authorized by Congress and the President pursuant to the International Emergency Economic Powers Act of 1977 ("IEEPA"), Pub. L. No 95-223, §§ 201-08, 91 Stat. 1625, 1626-29. The Division of Foreign Assets Control, OFAC's immediate predecessor, was established under the Treasury Department in 1950. OFAC derives its authority from a variety of federal laws regarding economic sanctions and embargoes, particularly IEEPA.

201.    OFAC is intended to prevent "prohibited transactions," which it defines as "trade or financial transactions and other dealings in which U.S. persons may not engage unless authorized by OFAC or expressly exempted by statute." OFAC administers and enforces economic sanctions programs against countries, businesses, and groups of individuals, using the blocking of assets and trade restrictions to accomplish foreign policy and national security goals. It maintains and regularly updates several sanction lists identifying countries, entities, and individuals considered to be threats to national security.

### iii.    History of ITAR

202.    The International Traffic in Arms Regulations ("ITAR") are regulations promulgated by the U.S. State Department pursuant to authority vested in the President by the Arms Export Control Act of 1976 ("AECA"), Pub. L. 90-629, 90 Stat. 729, codified at 22 U.S.C. §§ 2278, *et seq.*

203.     On March 8, 2013, President Obama delegated via executive order that statutory authority to the Secretary of State to oversee the export and temporary import of certain defense articles and services. E.O. 13637, 78 F.R. 16129.

204.     ITAR strikes a deliberate, delicate balance as to the application of federal criminal statutes and regulatory controls over an assortment of federal agencies.

205.     ITAR contains its own definitions of foreign ownership and foreign control over firms "owned by one or more foreign persons," and "foreign control is presumed to exist where foreign persons own 25 percent or more of the outstanding voting securities unless one U.S. person controls an equal or larger percentage." 22 C.F.R. § 120.65.

206.     22 C.F.R. § 126.1(d)(1) contains specific prohibitions "for defense articles and defense services," which presently includes the foreign states of Belarus, Burma, China, Cuba, Iran, North Korea, Syria, and Venezuela.

207.     But the U.S. State Department has chosen to distinguish between foreign states for which "defense articles and defense services" "have a policy of denial," without limitation, and those foreign states which have "a policy of denial" "as specified." 22 C.F.R. § 126.1(d)(2).

208.     The latter category includes 16 separate foreign states, including Cyprus.

209.     No member of either the Commission or the General Assembly mentioned Cyprus at any point during consideration of Rule K or Act 174, nor any interest in regulating any conduct by Cypriots.

210.     With respect to development, drafting, and approval of Rule K, upon information and belief no representative of the State of Arkansas has expressed any interest in regulating any conduct by Cypriots; instead, the only consideration appears to have been Rule K's (and Act 174's) impact on China and Chinese nationals.

32

211.    The absence of any consideration of the implications of Rule K or Act 174 as to any nations other than China, Chinese nationals, or residents of China, shows the true purposes of Rule K and Act 174 were to discriminate against the Association's members, and others, based on their perceived race, alienage, and national origin.

212.    In sum, the federal government—through statutes, executive orders, executive agencies, and inherent powers—occupies the fields of foreign affairs, foreign investment, national security, and the intersection thereof.

213.    Rule K and Act 174 conflict with the deliberate, delicate balance that the federal government has struck with respect to these matters.

## IV.    CAUSES OF ACTION

### Count One: Violation of Equal Protection

214.    The Equal Protection Clause of the 14th Amendment to the U.S. Constitution provides that: "No State shall [...] deny to any person within its jurisdiction the equal protection of the laws."

215.    The Equal Protection Clause protects all persons in the United States regardless of their race, alienage, or national origin, including the Association, its members, and all persons similarly situated.

216.    The Equal Protection Clause prohibits the States from denying any person equal protection of the laws based on the person's race, alienage, or national origin. This includes laws that appear neutral on their face but are motivated by discriminatory intent and result in discriminatory practices or disparate treatment due to race, alienage, or national origin.

217.    Rule K and Act 174 invidiously target the Association's members based on their perceived race, alienage, and national origin.

33

218.    Rule K and Act 174 were enacted with the purpose and intent to discriminate against persons based on race, alienage, and national origin, in particular, Chinese nationals and naturalized U.S. Citizens of Chinese ancestry.

219.    Rule K and Act 174 are not narrowly tailored to meet a compelling state interest.

220.    As a matter of Arkansas constitutional law, discriminatory classifications regulating property rights based on race, alienage, or national origin are not a legitimate governmental interest. Ark. Const. Art. 2, § 20; *Applegate v. Lum Jung Luke*, 173 Ark. 93, 291 S.W. 978 (1927).

221.    Intentional discrimination against out-of-state business is not a legitimate state purpose. *Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 880 (1985).

222.    Rule K and Act 174 deprive Chinese persons, naturalized U.S. Citizens of Chinese ancestry, and persons perceived to be Chinese, from the equal protection of the laws, including laws relating to their fundamental rights.

223.    Were Section 7 of Act 174 actually codified, all existing digital asset mining companies operating in Arkansas, including all members of the Association, would have to submit an affidavit within 90 days of the effective date of Rule K attesting that each is not "a prohibited foreign party-controlled business," as a necessary condition to seek a novel permit that is a legal requirement to continue their otherwise lawful (and pre-existing) business operations.

224.    All existing digital asset mining companies operating in Arkansas therefore sustain "injury" directly caused by the regulatory burdens of Rule K and Act 174.

225.    Under the imminent application of Rule K and Act 174, specific members of the Association will be prohibited from continuing their existing lawful business operations.

226.    The imminent application of Rule K and Act 174 will cause ongoing and irreparable harm to specific members of the Association.

227.    Rule K and Act 174 deprive specific members of the Association the opportunity to grow business expectancies by limiting their ability to attract capital investment and reducing the value of their business expectancies and current and potential capital investments, thereby causing irreparable harm to their goodwill.

228.    In implementing and enforcing Rule K and Act 174, Defendants are acting under color of state law to deprive specific members of the Association their rights, privileges, and immunities granted under the U.S. Constitution and federal law.

### Count Two: Violation of the Right to Procedural Due Process

229.    The Due Process Clause of the 14th Amendment provides: "No State shall […] deprive any person of life, liberty, or property, without due process of law[.]"

230.    The protections of the Due Process Clause apply to all persons in the United States regardless of their race, alienage, and national origin, including the Association's members.

231.    The Due Process Clause protects the fundamental rights and liberty interests of all persons in the United States from unreasonable governmental interference through state action, including that which is arbitrary, irrational, oppressive, discriminatory, and egregious. This entails the right to procedural due process, which consists, at a minimum, of the right to fair notice and an opportunity to be heard.

232.    Rule K and Act 174 are impermissibly vague, indefinite, and ambiguous because they do not codify actual retroactive application to existing business expectancies; and they therefore fail to provide sufficient notice about which properties and persons are subject to their classifications, prohibitions, penalties, and requirements.

233.    As to pre-existing uses of property exercised by members of the Association, Rule K and Act 174 fail to overcome the strong presumptions against retroactivity, and cannot apply to vested property rights which pre-exist the enactment of Act 174 or the promulgation of Rule K.

234.    The vagueness and lack of adequate guidelines under Rule K and 174 authorizes and encourages arbitrary and discriminatory enforcement by Defendants and confer excessive discretionary authority to Director Bengal, in determining whether to grant or deny permits under Rule K, which would be required for existing digital asset mining companies to continue conducting their otherwise lawful business activities, even as to those which pre-exist both Rule K and Act 174.

235.    The enactment and enforcement of Rule K and Act 174 have caused and will continue to cause ongoing and irreparable harm to specific members of the Association by depriving them of their rights to due process of law.

236.    In implementing and enforcing Rule K and Act 174, Defendants are acting under state law to deprive the Association, its members, and all persons similarly situated, their rights, privileges, and immunities granted under the U.S. Constitution and federal law.

### Count Three: Violation of the Commerce Clause

237.    Article I, Section 8, clause 3 of the Constitution gives Congress the power to "regulate Commerce with foreign nations" as well as interstate commerce.

238.    The Commerce Clause thereby limits the powers of states to regulate commerce across U.S. borders. *See Wardair Canada, Inc. v. Florida Dep't of Revenue*, 477 U.S. 1, 8 (1986); *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 749 (5th Cir. 2006) ("This negative aspect of the Commerce Clause applies both to the Foreign Commerce Clause [...] and to the Interstate Commerce Clause.").

239.     The Commerce Clause prohibits the enforcement of state laws driven by economic protectionism favoring intrastate commerce and disfavoring out-of-state or foreign commerce.

240.     Rule K and Act 174 facially discriminate against out-of-state and foreign commerce in favor of in-state commerce.

241.     Rule K threatens to shut down existing business operations by denial of a permit application solely based on an applicant's status as a "prohibited-foreign-party," *i.e.*, an out-of-state or foreign business.

242.     Because Rule K and Act 174 treat domestically owned business entities differently than foreign-owned business entities, they discriminate against foreign commerce in violation of the Foreign Commerce Clause. *See Piazza's Seafood*, 448 F.3d at 750 ("The problem with the Catfish Statute is [...] that it discriminates against foreign commerce.").

243.     "Absent a compelling justification [...] a State may not advance its legitimate goals by means that facially discriminate against foreign commerce." *Kraft Gen. Foods v. Iowa Dep't of Revenue & Finance*, 505 U.S. 71, 81 (1992).

244.     "Discriminatory treatment of foreign commerce may create problems, such as the potential for international retaliation, that concern the Nation as a whole." *Id.* at 79.

245.     "[A] State's preference for domestic commerce over foreign commerce is inconsistent with the Commerce Clause even if the State's own economy is not a direct beneficiary of the discrimination." *Id.*

246.     By preferring in-state digital asset mining companies over out-of-state or foreign digital asset mining companies, Rule K and Act 174 violate the Foreign Commerce Clause of the U.S. Constitution.

247.    Therefore, Rule K and Act 174 are subject to strict scrutiny, and their enforcement should be preliminarily and permanently enjoined.

### Count Four: Violation of the Supremacy Clause of the U.S. Constitution via Preemption of Rule K and Act 174 by Federal Regimes Governing Foreign Affairs, Foreign Investment, and National Security

248.    The Supremacy Clause of the U.S. Constitution states: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, Para. 2.

249.    The Supremacy Clause establishes the doctrine of federal preemption, which mandates that federal law preempts state law in any area over which Congress has expressly or impliedly reserved exclusive authority or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal law or objectives.

250.    Rule K and Act 174 are preempted by federal regimes governing foreign affairs, foreign investment, and national security, including CFIUS, OFAC, and ITAR. Under federal law, CFIUS is authorized, *inter alia*, to review foreign investment transactions with respect to national security concerns, as well as to review business interest transactions by foreign persons. OFAC is responsible for administering and enforcing economic regulations. And the ITAR sets carefully crafted restrictions on transactions with foreign parties with sensitive implications for national security and foreign affairs.

251.    Foreign relations, the power to deal with national security threats posed by foreign countries, and foreign commerce are the exclusive powers of the federal government. The U.S. Constitution vests the federal government the primary powers to manage foreign affairs and to

regulate foreign commerce. *See, e.g.*, U.S. Const., Art. I, Sec. 10, Cl. 1, 3 (foreign affairs); U.S. Const., Art. I, Sec. 8, Cl. 3 (commerce with foreign nations).

252.    The federal government has long occupied the fields of foreign affairs, foreign investment, national security, and the intersection thereof, especially with respect to foreign relations with China.

253.    Given the comprehensiveness of federal statutory, regulatory, and administrative schemes, federal law has "occupied" the entire field, thus precluding any state regulation such as attempted under Rule K and Act 174.

254.    The State of Arkansas has explicitly stated its intent to regulate in these areas of foreign affairs and foreign investment, as they bear on national security, when promulgating Rule K and enacting Act 174.

255.    With specific reference to Rule K, as authorized under Act 174, the Governor's Office stated, "Governor Sanders was the first governor in the country to kick a Communist Chinese-owned company out of her state and strongly supports outlawing foreign adversaries from owning crypto mines in Arkansas[.]"

256.    The Governor of Arkansas and members of the Arkansas General Assembly have repeatedly emphasized the purported need to legislate based on "the defense issue for our nation" and to "hold China accountable."

257.    In so doing, Rule K and Act 174 attempt to regulate through state law a field exclusively occupied by the federal government, specifically, the intersection between foreign affairs, national security, and foreign investment, including foreign business capital investment and interstate and foreign commerce.

258.    Conflict preemption occurs when a state regulation "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012).

259.    "State laws in conflict with federal law are 'without effect.'" *United States v. Iowa*, 126 F.4th 1334, 1344 (8th Cir. 2025) (quoting *Mutual Pharm. Co. Inc. v. Bartlett*, 570 U.S. 472 (2013)).

260.    The prohibitions and penalties imposed under Rule K and Act 174 usurp the power vested by the Constitution and by Congress in the federal government to investigate, review, and take action with respect to foreign investments that could implicate national security policy.

261.    Rule K and Act 174 intrude upon the federal government's power to govern foreign affairs generally.

262.    Act 174 locks its definition of "prohibited foreign party" to the ITAR's classification list under 22 C.F.R. § 120.1 as to a specific date: January 1, 2024, even as Act 174 attempts to supplant the ITAR's definition of "foreign party," as defined by the ITAR. Ark. Code Ann. § 14-1-606(a)(3).

263.    In so doing, Act 174 would continue to apply to a foreign nation, even if that nation is removed from the ITAR by the State Department; conversely, Act 174 could not apply to a foreign nation that the State Department later adds to the ITAR, resulting in foreseeable inconsistency between state and federal law.

264.    Thus, Act 174 seeks to establish Arkansas's own foreign policy, thereby intruding upon the federal government's exclusive power to govern foreign affairs. *See Zschering v. Miller*, 389 U.S. 429 (1968).

265.     Rule K and Act 174 intrude upon the federal government's power to govern foreign commerce, generally. By prohibiting "prohibited foreign parties" from specific countries from owning and acquiring business interests in digital asset mining companies operating in Arkansas, both laws discriminate against out-of-state individuals and entities based on race, alienage, and national origin, in particular, Chinese persons. They therefore burden international commerce, especially with respect to foreign investment.

266.     Rule K and Act 174 unavoidably conflict with the deliberate, delicate balance that the federal government has struck with respect to foreign affairs, foreign investment, and national security, and accordingly, they are preempted by federal law.

267.     By their plain text, Rule K and Act 174 would punish a non-resident Cypriot for buying even a single share in a public company that conducts data asset mining activities in Arkansas.

268.     But Rule K and Act 174 would also punish that public company for that non-resident Cypriot's solitary share purchase by depriving that company's permit to do business.

### Count Five: Taking Without Just Compensation

269.     "The Takings Clause of the Fifth Amendment provides that private property shall not 'be taken for public use, without just compensation.'" *Murr v. Wisconsin*, 582 U.S. 383, 392, 137 S. Ct. 1933, 1942 (2017) (citing U.S. Const. amend. V.).

270.     A property owner has the right to bring a taking claim against a State directly under the Fifth Amendment in the absence of an adequate and available state cause of action. *See DeVillier v. Texas*, 601 U.S. 285, 144 S. Ct. 938 (2024).

271.     Rule K and Act 174 threaten to take property belonging to the Association's members without just compensation.

272.    There is no adequate and available cause of action available to the Association's members to bring a taking claim for damages against the State of Arkansas under Arkansas law.

273.    As to specific members of the Association, whose lawful business activities were vested and pre-existing of either Rule K or Act 174, those members' acquisitions and uses of their real property and lawful business operations were lawful when established.

274.    Thus, Rule K and Act 174 attempt to criminalize pre-existing lawful business investments and activities of specific members of the Association, which constitutes a taking of their property without compensation in violation of due process of law. *Blundell v. City of West Memphis*, 258 Ark. 123, 522 S.W.2d 661 (1975).

275.    Rule K and Act 174 intentionally, discriminatorily, and specifically interfere with distinct investment-backed expectations belonging to specific members of the Association.

276.    Rule K and Act 174 provide for forced divestiture of private property with no requirement to make just compensation to the owner.

277.    The State of Arkansas has given no compensation to any member of the Association, and neither Rule K nor Act 174 obligates the State of Arkansas to do so.

278.    In the absence of just compensation, all Defendants must be enjoined from proceeding with any enforcement measure under Rule K and Act 174, specifically including but not limited to the permit-application process required under Rule K, which could deprive specific members of the Association of their private property or distinct investment-backed expectations.

279.    Members of the Association have already expended substantial capital investments to construct and operate digital asset mining businesses in Arkansas.

280.    If either Rule K or Act 174 is allowed to be enforced, then specific members of the Association are entitled to recover from the State of Arkansas just compensation in the amount of

their past capital expenditures and the anticipated net revenue from their distinct investment-backed expectations for the reasonable duration of their anticipated business expectancies.

## V.    REQUESTS FOR RELIEF

WHEREFORE, plaintiff Arkansas Cryptomining Association requests that the Court enter judgment in its favor and:

A.    Declare Rule K and Act 174 unconstitutional under the 14th Amendment to the U.S. Constitution because they violate specific members of the Association of the right to equal protection of the laws.

B.    Declare Rule K and 174 unconstitutional under the 14th Amendment to the U.S. Constitution, facially and as applied, because they deprive specific members of the Association of the right to due process.

C.    Declare Rule K and Act 174 unconstitutional under the commerce clause as they facially discriminate in favor of in-state commerce to the detriment of interstate and foreign commerce.

D.    Declare Rule K and Act 174 unconstitutional under the Supremacy Clause of the U.S. Constitution as preempted by federal law.

E.    Declare Rule K and Act 174 unconstitutional as takings without just compensation under the 5th and 14th Amendments to the U.S. Constitution.

F.    Preliminarily and permanently enjoin Defendants from implementing and enforcing Rule K and Act 174 against any person, including the Association and its members.

G.    Award the Association its reasonable attorneys' fees, costs, and expenses in bringing this civil action.

H.    Grant all other relief this Court deems just and proper.

Dated:  March 13, 2025                    **KUTAK ROCK LLP**

By: _____

Frederick H. Davis, Ark. Bar No. 2012271
Alexander T. Jones, Ark. Bar No. 2015246
McKenzie L. Raub, Ark. Bar No. 2019142
124 West Capitol Avenue, Suite 2000
Little Rock, AR  72201-3740
Telephone: (501) 975-3000
Facsimile: (501) 975-3001
frederick.davis@kutakrock.com
alex.jones@kutakrock.com
mckenzie.raub@kutakrock.com

Peyton C. Watts, Ark. Bar No. 2020165
1227 E. Joyce Blvd., Suite 300
Fayetteville, AR 72703
Telephone: (479) 973-4200
Facsimile: (479) 973-0007
peyton.watts@kutakrock.com

*Attorneys for Arkansas Cryptomining Association*

Docusign Envelope ID: ED61DFCA-672C-4C95-A6D8-1A88B191D904

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**ARKANSAS CRYPTOMINING ASSOCIATION,**                          **PLAINTIFF**
**on behalf of its members and all other persons
similarly situated**

**v.**                          **CASE NO.:** _____

**LAWRENCE BENGAL, in his official capacity as the**            **DEFENDANTS**
**Director of the Arkansas Oil and Gas Commission;
ARKANSAS OIL AND GAS COMMISSION;
TIM GRIFFIN in his official capacity as the
Attorney General of Arkansas; and
STATE OF ARKANSAS**

---

### DECLARATION OF CONNOR L. KEMPTON

---

I, Connor L. Kempton, make the following declaration pursuant to 28 U.S.C. § 1746:

1.    I am an adult of sound mind capable to swear an oath and attest to the following facts.

2.    I am a director of the Arkansas Cryptomining Association ("the Association").

3.    The Association is a nonprofit corporation organized under Arkansas law.

4.    The Association's purposes are to improve business conditions for and promote the digital asset mining industry in Arkansas and to oppose and prevent discriminatory industry-specific taxes, regulations, and other public policy that will stifle the growth of a burgeoning industry in Arkansas.

5.    Act 174 of 2024 and Rule K, as promulgated by the Arkansas Oil and Gas Commission, impose discriminatory industry-specific taxes and regulations on digital asset mining companies, including all the Association's members.

<div style="border:1px solid black;">

**EXHIBIT**

**1**

</div>

Docusign Envelope ID: ED61DFCA-672C-4C95-A6D8-1A88B191D904

6.    The Association's members are small businesses that own or operate digital asset mining facilities, or which wish to commence operations at future digital asset mining facilities.

7.    The Association's members include Jones Eagle, LLC and NewRays One, LLC.

8.    Enforcement of Act 174 and Rule K would deprive Jones Eagle, LLC and NewRays One, LLC of the opportunity to grow their businesses by limiting their ability to attract capital investment and reducing the value of their business expectancies and current and potential capital investments, thereby causing irreparable harm to their goodwill.

9.    Rule K would require all existing digital asset mining companies operating in Arkansas (including all the Association's members) to submit an affidavit within 90 days attesting that each is not a "foreign party-controlled business," as a necessary condition to seek a novel permit that is a legal requirement to continue their otherwise lawful and pre-existing business operations.

10.    I have reviewed Exhibit 3 to the complaint in this action, and it is a true and correct copy of the comments the Association submitted in opposition to Rule K on January 13, 2025.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct as within my personal knowledge.

Date: _____ 3/11/2025 _____

*Connor Kempton*

5617207393CB48A

Connor L. Kempton

As Director and on behalf of the Arkansas Cryptomining Association

**Peter Alberg (adpce.ad)**

| | |
|---|---|
| **From:** | aogc.lbengal@gmail.com |
| **Sent:** | Tuesday, November 26, 2024 2:45 PM |
| **To:** | Peter Alberg (adpce.ad) |
| **Subject:** | Fwd: FYI - Data Center Foreign Ownership Law Blocked in Federal Court |

Pete - FYI - Lauren sent this article this morning, obviously it may impact our rule, but I have no problem with the public notice going forward unless Shane and Lauren do.

Sent from L Bengal iPhone

Begin forwarded message:

> **From:** Lauren Ballard <Lauren.Ballard@arkansas.gov>
> **Date:** November 26, 2024 at 8:38:23 AM CST
> **To:** Shane Khoury <Shane.Khoury@arkansas.gov>, "larry.bengal"
> <larry.bengal@aogc.state.ar.us>
> **Subject: FYI - Data Center Foreign Ownership Law Blocked in Federal Court**

## Federal Judge Temporarily Blocks Arkansas Laws on Data Center Ownership

**A federal judge** has temporarily **blocked the state** from enforcing **two laws affecting digital data centers, or crypto mines**, the Arkansas Democrat-Gazette reports.

- The laws passed in 2023 and 2024 **prohibit any ownership interest** in digital mining operations in Arkansas by **"prohibited foreign-party controlled businesses"**
- Crypto-mining firm **Jones Eagle LLC, owned by Qimin "Jimmy Chen,"** a naturalized U.S. citizen of Chinese origin, **sued the state on claims that the laws violate the U.S. Constitution**
- Chen's lawsuit alleges that the law violates the **equal protection**, **due process**, **Commerce**, **Supremacy, and Takings** clauses

**Judge's decision:** In her 10-page order, **Chief U.S. District Judge Kristine G. Baker** issued a restraining order effective for 14 days, saying **Chen is likely to prevail** on the merits of his case.

**State's response: Attorney General Tim Griffin** said he would **"continue to proudly and vigorously defend"** the law.

**What's next: A hearing for a preliminary injunction** is expected in **early December** to determine further action.

**Lauren Ballard**
**Chief of Staff**

EXHIBIT
2

1

**Department of Energy and Environment**
t: 501.682.0581 |  e: lauren.ballard@arkansas.gov



Book time to meet with me

From: Sue Ellen Ray [mailto:SRay@wlj.com]
Sent: Monday, January 13, 2025 2:52 PM
To: Shannon Raglin
Cc: William J. Ogles; Mark Allison
Subject: RE: Arkansas Cryptomining Association

Good afternoon.  On behalf of Will Ogles, attached please find
correspondence regarding the referenced
matter along with comments. If you have any questions, please
contact Will directly at 501-212-1205 or
wogles@wlj.com.

Thank you,
Sue Ellen Ray


Sue Ellen Ray
Assistant
501.212.1378 | SRay@wlj.com

Wright, Lindsey & Jennings LLP
200 West Capitol Avenue, Suite 2300 | Little Rock, AR 72201
Main 501.371.0808 | Fax 501.376.9442 | wlj.com

EXHIBIT
3

1

**YYI**

## WRIGHT LINDSEY JENNINGS

200 West Capitol Avenue, Suite 2300   Little Rock, AR 72201-3699   Main 501.371.0808   Fax 501.376.9442   wlj.com

**William J. Ogles**
ATTORNEY

Direct: 501.212.1205 | wogles@wlj.com

January 13, 2025

*VIA USPS & E-MAIL*

Lawrence E. Bengal, Director
Oil and Gas Commission
5301 Northshore Drive
North Little Rock, AR 72118

RE: Oil and Gas Commission General Rule K- Public Comment

Dear Director Bengal,

Please find enclosed comments of the Arkansas Cryptomining Association.
Please let us know if you have any questions or need anything additional.

Sincerely,

WRIGHT, LINDSEY & JENNINGS LLP

William J. Ogles

cc:    Shannon Raglin | Shannon.Raglin@aogc.state.ar.us
       Mark Allison | Firm

Docusign Envelope ID: 8AAE45D0-93D5-4C6B-8CD2-F93EBA396416

**COMMENTS OF THE ARKANSAS CRYPTOMINING ASSOCIATION
ARKANSAS OIL & GAS COMMISSION PROPOSED GENERAL RULE K**

JANUARY 13, 2025

The Arkansas Cryptomining Association (the "Association") submits the following comments on the Arkansas Oil & Gas Commission's Proposed General Rule K. The Association is an Arkansas non-profit corporation organized for the purpose of improving business conditions for the cryptomining industry in Arkansas. Members of the Association are small businesses that own and/or operate cryptomining facilities located in Arkansas. The Association hopes to act as a resource to the Commission in this rulemaking and more generally as a resource to understand the developing cryptomining industry, its operations, and the challenges presented by excessive government regulation. Specifically, through its comments the Association seeks cryptomining rules that are fair, that meaningfully address demonstrable, significant public health and safety impacts, that can be responsive to and supportive of local communities, that comply with constitutional and statutory limits on regulation, that are no more stringent than necessary, that can contribute to the welfare and economy of the state, and that are consistent with a policy of the least amount of regulation necessary and eliminating regulatory over-reach and unnecessary burden.

4906-4539-3679.1

Docusign Envelope ID: 8AAE45D0-93D5-4C6B-8CD2-F93EBA396416

1. <u>The Commission should adopt a reasonable transition rule for existing facilities to apply for a permit.</u>

Rule K-1(b)(2) prohibits existing digital mining asset businesses from operating unless they apply for a permit *within 90 days after Rule K is promulgated.* However, Rule K-2(f)(1) and (2) require that a digital asset mining business publish a public notice and provide mailed notice to certain parties "at least forty-five (45) days <u>prior</u> to filing the application with the Commission." In addition, Rule K-2(f)(3)(D) requires that during this 45-day pre-application public notice period that the applicant must "deliver the application to [an] interested party as directed by the Commission."

As a practical matter, for existing digital asset businesses this process requires that a final permit application be ready and available to the public within 30 to 40 days after the rule becomes final, at the risk of being deprived of the right to operate if the public notice is not published within 45 days before the 90-day application deadline. Furthermore, some required application items such as the electric and water utility certifications required by Rule K-2(e)(5) and (6), and the technical schematic and engineering specifications in Rule K-2(3)(8), may not be readily available during such a short time period. The rule does not contain a mandate for electric or water utilities to make such a certification; nor is there a time limit for the utilities to do so.

At a minimum the Rule should include a process for existing facilities to obtain extensions of time for the 45-day public notice deadline and the 90-day permit application filing deadline.

2. <u>The ability to operate should not be conditioned on compliance "with all local government ordinances."</u>

Rule K-1(b)(3)(C) requires that in order to operate, a digital asset mining business must maintain compliance with **all** local government ordinances. This is overbroad, since it effectively delegates veto power over the ability of a digital asset mining facility to operate to a local governmental body, regardless of whether a particular local ordinance is related to any aspect of Rule K, or the statutes governing digital asset mining. Moreover, this could result in uneven development and regulation of cryptomining across the state.

This Rule should provide that contrary provisions of local government ordinances and regulations are preempted by the issuance of a Commission permit.

4906-4539-3679.1

Docusign Envelope ID: 8AAE45D0-93D5-4C6B-8CD2-F93EBA396416

3. <u>Prohibiting digital asset mining businesses from operating based on non-compliance with other ordinances and state and federal laws is overbroad and discriminates against digital asset mining businesses.</u>

Rules K-1(b)(3)(C) and (E) are overbroad and discriminate against digital asset mining businesses by conditioning authority to operate on maintaining compliance with **all** local government ordinances and **all** applicable state and federal laws.  Other ordinances and laws have their own enforcement, penalties, and compliance mechanisms that are tailored to the specific ordinance or law at hand and that are deemed effective to compel compliance; however, this provision of Rule K adds on top of those penalties and compliance regimes, the prospect that digital asset mining businesses would not be able to operate based on "non-compliance" with any such an ordinance or law. Any determination of non-compliance should be made only through the existing enforcement mechanisms and limited to the prescribed penalty, under the applicable local governmental ordinance or applicable state or federal law, not through a separate determination by the Commission.

Furthermore, this provision is discriminatory because it only applies to digital asset mining businesses, and other types of businesses that may be in non-compliance with a local ordinance or state or federal law are not faced with the prospect of not being able to operate even though they may be in non-compliance.

4. <u>The Rule should clarify that local regulation of digital asset mining businesses is limited to areas of regulation that are not addressed by state or federal law or the Commission's rule, and that local regulation of digital asset mining businesses must be consistent with federal law, state law, and the Commission's rule.</u>

Rules K-1(c)(10) and (13) define "Legislative body" and "Ordinance" respectively for purpose of Rule K.  "Ordinance" is defined to include "appropriate" enactments; however, it does not define what is "appropriate." Consistent with Ark. Code Ann. § 23-119-105(f), "appropriate" should be defined to mean (a) matters or areas of regulation not already addressed by federal law, state law or the Commission's rules and (b) legislative enactments that are consistent with federal law, state law or the Commission's rules.  In addition, in Rule K-1(c)(13) the word "appropriate"

4906-4539-3679.1

should modify the words "ordinance" and "resolution" as well as "other legislative enactment of a legislative body."

5. <u>The Rule should only regulate persons who have actual control over a digital asset mining business.</u>

Rule K-1(c)(15) defines "regulated entity" as "*any person associated with* a mining facility, a digital asset miner, or a mining facility." (emphasis added). Rules K-4(b), (c), (d) and (e) subject a "regulated entity" to enforcement action by the Commission. This Rule is overbroad. There is no definition of "associated with" and consequently the Rule provides the Commission with authority to take enforcement action against service providers, investors, finance companies, accountants, attorneys and many other types of individuals who have some connection with a digital mining asset facility. The term regulated entity should be limited to persons with actual control over the digital asset mining facility. In addition, the definition repeats the phrase "mining facility," which is redundant.

6. <u>The Rule lacks an effective mechanism to compel electric and water utilities to certify the impacts of a digital asset mining business.</u>

Rules K-2(e)(5) and (6) require a digital asset mining business as part of the application for a permit to provide a copy of an agreement with an electric power supplier or a water supplier or utility that certifies that the use of electricity will not negatively impact the local electric grid or the local water supply or increase electric costs or water rates to local customers. However, the Rule does not require an electric utility or water utility to prepare and provide such a certification; consequently, it may be impossible for a digital asset mining business to comply with this permit application requirement, and for existing digital asset mining businesses to comply in a timely manner to meet the 90-day requirement for filing a permit application.

This permit application requirement is outside the effective control of a permit applicant, and may be subject to the regulatory authority of other state agencies, including but not limited to the Arkansas Public Service Commission. The Rule does not contain provisions, nor does the Rule identify the source of the Commission's authority, to require electric and water suppliers to provide such certifications to a permit applicant in a timely manner.

Page 4 of 12

Docusign Envelope ID: 8AAE45D0-93D5-4C6B-8CD2-F93EBA396416

The Rule does not provide any definition of "negatively impact" to guide digital asset mining businesses or electric utilities or water utilities in making such an assessment.

7. <u>The Rule should not limit the types of noise-reduction techniques that may be used.</u>

Rule K-2(e)(8) as written requires a digital asset mining business to include in its permit application technical information for one of three types of noise reduction techniques – (1) liquid or submerged cooling; (2) full enclosure with material reasonably calculated to reduce noise emissions; or (3) passive cooling without complete enclosure for a location at least 2000 feet away from the nearest residential or commercial structure, or in an area zoned for industrial or other approved use.  However, Ark. Code. Ann. § 14-1-604(b)(3) does not limit noise-reduction techniques to those three possibilities.  That provision states that a digital asset mining business must apply "noise-reduction techniques", but does not limit such techniques to those three possibilities.  The Rule should clarify that other techniques and technology may be used to meet  statutory requirements, for example noise easements or licenses, noise canceling technology, etc.

Furthermore, the Rule is arbitrary in that for fully enclosed systems it only requires use of material reasonably calculated by industry standards to reduce noise emissions to a level acceptable to a reasonable person, but for passively cooled systems the digital asset mining facility must relocate at least 2000' feet from a residential or commercial structure or an industrial zoned area, even if the passively cooled system reduces noise emissions to a level acceptable to a reasonable person.  Because the purpose of the Act is to "reduce noise emissions to a level acceptable to a reasonable person", and because digital asset mining facilities may be able to satisfy that purpose even if located closer than 2000' feet from a residence, the 2000' setback requirement or location in an industrial zoned area is arbitrary.  Furthermore, the Act distinguishes home digital asset mining from a digital asset mining business, and appears to allow home digital asset mining in residential areas without having to apply noise reduction techniques or to "reduce noise emissions to a level acceptable to a reasonable person."

In addition, the Rule should provide a longer transition period for existing facilities to come into compliance with the requirement to install noise-reduction techniques or relocate existing facilities to approved locations.  Furthermore, the technology requirements in Rule K should not

4906-4539-3679.1

apply to facilities constructed before the effective date of the Arkansas Data Centers Act, Ark. Code Ann. §§ 14-1-601, *et seq.,* which preempts any contrary provision under the Rule.

8. <u>The Rule should adopt the same regulatory scheme as used for sound levels generated by gas compressor facilities. *See* Ark. Code Ann. § 15-71-110; General Rule D-20 ("Noise Level Requirements for Non-Wellhead Compressor Facilities").</u>

Commission Rule D-20 regulates noise from natural gas compressor stations and does so by defining "noise sensitive areas" and then determining compliance with the noise standard from the nearest point of a "noise sensitive area" at the time of the construction of the facilities.  See Rule D-20 (c) and (d).

Under that regulatory regime, "noise sensitive area" is defined as "a building with an established mailing address that is being utilized as a private residence, school, hospital, church, nursing home, or other building of a type that is regularly used for overnight accommodation." Rule D-20(b)(3).

The Commission should consider adopting a time-weighted noise standard for Rule K that would protect against significant harm to public health and safety or damage to property, and a similar compliance regime as Rule D-20 by defining "noise sensitive area" and demonstrating compliance with the noise standard at the boundary of the noise sensitive area at the time of construction.

Rule D-20(c) provides that the sound levels should be "***measured from the exterior of the nearest noise sensitive area*** at the time of commencement of initial construction of the non-wellhead compressor facility or station." (emphasis added).

For the same reasons discussed above, the purpose of the Rule, in part, is to keep sound levels from the mining facilities at a level acceptable to a reasonable person. Therefore, the Rule should prioritize actual *individuals*, not structures. Currently, the Rule is overbroad in this respect and would encompass areas where people are not necessarily present. For example, under the current Rule, mining facilities would be prevented from locating next to abandoned "residential" or "commercial use structures." Moreover, there are several "commercial use structures" located in Arkansas that would be louder than digital asset mining facilities.

9. <u>Rule K-2(f)(3) should be re-written to make the time frame for public notice of a permit application consistent with the time frame for filing that permit application with the Commission.</u>

  Rule K-2(f)(3) does not make sense. It requires publication of a notice stating that the permit application may be obtained from the Commission 45 days before the application is required to be filed with the Commission per Rule K-2(f)(1). The rule should be rewritten to require public notice of the application at the time the application is filed with the Commission, or to delete the language stating that a copy of the permit application may be obtained from the Commission.

10. <u>If no objections are received for a permit application and the application is complete, the permit should be issued without referral to the Commission.</u>

  Rule K-2(g)(2) provides that the Director may refer a permit application to the Commission under certain circumstances even if the application is administratively complete and no timely objections have been received. If no timely objection has been received and the application is complete and complies with statutory requirements, the Director should be required to issue the permit.

11. <u>The Rule should have a time deadline for issuing a non-controverted permit, and to take final action on a controverted permit.</u>

  Rule K-2(h) states that if the applicant satisfies the requirements of all applicable statutes and Rule K, then a permit shall be issued. For a non-controverted permit application, the permit should be issued within 30 days after the permit application is filed. For permit applications referred to the Commission, the permit should be issued or denied within 120 days after the permit application is filed.

12. <u>The issuance of a permit should act as a shield.</u>

  The Rule should clarify that issuance of a permit should act as a shield, e.g., a complete affirmative defense against a lawsuit brought under Ark. Code Ann. § 14-1-604(g).

  Alternatively, a complainant should be required to exhaust administrative remedies by filing a complaint with the Director under Rule K-4(d), before initiating a lawsuit under Ark. Code Ann. § 14-1-604(g).

13. <u>The rule should clarify that denial of a new or renewal permit application should not be based on failure to abate a violation of **any** statue or rule.</u>

    Rule K-2(h)(2) and (3) allows denial of a new or renewal permit if the applicant or other person with a five percent (5%) interest in the digital asset mining business has failed to abate any outstanding violation "of statutes or rules." This Rule exceeds the Commission's statutory authority.

    Alternatively, this provision should be clarified that it is limited to failure to abate violations of the Arkansas Digital Asset Mining Business Act (Ark. Code Ann. § 23-119-101) or the Arkansas Data Centers Act (Ark. Code Ann. § 14-1-601), or regulations promulgated thereunder.

14. <u>Permit denial should not be based on a history of violations of other statutes or rules by five percent (5%) owners of a digital asset mining business.</u>

    Rule K-2(h)(4) requires denial of a new or renewal permit if the Director determines that a person with an interest exceeding five percent (5%) of the digital asset mining business has "a history of violating <u>any applicable statutes</u>, Commission rules, permit condition or order of the Commission, <u>the Arkansas Pollution Control and Ecology Commission</u>, or <u>any other state or federal regulatory agency</u>." (emphasis added).

    This provision, particularly with respect to the underlined phrases, is overly broad and over reaching. Furthermore, it exceeds the Commission's authority because is not authorized by statutes. Unlike the so called "non-compliance determination" provision of Pollution Control & Ecology Rule 8.204, there is no statute that authorizes such a far-reaching provision, like Ark. Code Ann. § 8-1-106. Even so, such a provision runs the risk of violating the constitutional right to freely associate because it is not narrowly drawn to achieve the goals of the authorizing statute.

    Additionally, the term "history of violating" is undefined. As written, that phrasing suggests that even entities which have become fully compliant with all applicable statutes, rules, permit conditions, and orders could remain at risk of deprivation of existing uses of their property interests due solely to past non-compliance. The Commission should supply a definition of "history of violating" that includes a specific exception for previous compliance issues which have been substantially abated or this provision should be deleted.

4906-4539-3679.1

15. <u>Rule K should not allow revocation of a permit for violation of **any**</u>
    <u>other statute or law.</u>

      Rule K-2(j)(C) permits the Director to revoke a permit based on failure
by the permit holder to meet any <u>applicable</u> statute or law. This provision
should be clarified that "applicable" means the Arkansas Digital Asset
Mining Business Act (Ark. Code Ann. § 23-119-101) or the Arkansas Data
Centers Act (Ark. Code Ann. § 14-1-601). Otherwise, the provision is
overbroad, raises the potential of interference with other regulatory agencies,
and violation of the anti-delegation doctrine.

16. <u>Rule K-2(j)(2) should contain a procedure for lifting the stay during a</u>
    <u>permit appeal.</u>

      Rule K-2(j)(2) allows a permit holder to appeal the Director's decision
to revoke a permit. During the appeal process operation of a facility may not
commence or continue. This is overly broad. For existing permits, the ability
to operate should remain in effect during the appeal unless it is shown that
continued operation during the appeal would cause significant harm to public
health and safety or damage to property. (see Rule K-4(b)(1)(C)). For new
permits, the stay should be lifted during the appeal if the stay would have
adverse economic or financial impacts on the permit applicant and operation
of the facility during the appeal would not cause significant harm to public
health and safety or damage to property.

17. <u>Transfer of a digital asset mining business permit should apply to the</u>
    <u>transfer of ownership or control of the digital asset mining facility – not to</u>
    <u>the transfer of an ownership interest in the digital asset mining business or</u>
    <u>facility.</u>

      Rule K-3 sets forth the procedure for transferring a digital asset
mining permit. Rule K-3(b) states that the procedure applies to "<u>all transfers</u>
of the interest of the permit holder, including…<u>A change of ownership or</u>
<u>membership in the corporate entity</u> that operates the digital asset mining
business [.]" This requirement is too broad and would apply to <u>any change</u> in
the membership of a permit holder, regardless of whether that change could
or would affect the ability to control or operate the facility, and regardless of
whether that change involved a prohibited foreign party.

4906-4539-3679.1

18. <u>Rule K-3(f)(2) and (f)(4) are not clear, are vague and ambiguous, and do not make sense.</u>

Rule K-3(f)(2) provides that the Director shall deny a permit transfer if "the Commission has not approved the transfer in accordance with paragraph e) above." However, Rule K-3 does not contain any requirement for Commission approval of a permit transfer; instead Rule K-3 contemplates that the Director will make a decision on transfer approval (see Rule K-3(k)), and that if the permit transfer is denied, the permit applicant can appeal to the Commission. Furthermore, paragraph e) referenced in Rule K-3(f)(2) contains no reference to Commission approval, but simply states broad requirements for the new permit holder. This provision should be deleted or clarified.

Rule K-3(f)(4) permits the Director to deny a permit transfer if "no other permits may be issued in accordance with paragraph e) above." Again, the provisions of paragraph (e) do not make any sense in connection with the phrase "no other permits may be issued." This subparagraph should be deleted or clarified.

19. <u>Rule K-3(h) should be limited to the statutes that Rule K implements.</u>

Rule K-3(h) should clarify that the reference in the first line to "any rules, statutes" is to the Arkansas Digital Asset Mining Business Act (Ark. Code Ann. § 23-119-101) or the Arkansas Data Centers Act (Ark. Code Ann. § 14-1-601), or a rule promulgated to implement a provision of those acts.

20. <u>Rule K-3(l) should remove or modify the provisions regarding operation upon revocation of a permit transfer or appeal of denial of a permit transfer decision.</u>

Rule K-3(l) allows the Director to revoke a permit transfer approval and requires a permit holder to cease operation upon notice from the Director. This is overbroad, unreasoned and is different from the permit revocation provision in Rule K-2(j)(2); no explanation of the reason for this difference is given. Rule K-3(l) allows the permit holder to appeal the Director's decision to revoke a permit transfer decision. During the appeal process operation of a facility may not commence or continue. Like the provision in Rule K-2(j) this is overly broad and unreasoned. For existing permits, the ability to operate should remain in effect during the appeal unless it is shown that continued operation during the appeal would cause

4906-4539-3679.1

significant harm to public health and safety or damage to property (see Rule K-4(b)(C)). For new permits, the stay should be lifted during the appeal if the stay would have adverse economic or financial impacts on the permit applicant and operation of the facility during the appeal would not cause significant harm to public health and safety or damage to property.

21. Rule K-1(b)(3)(B) and K-2(e)(7) are preempted by federal law.

Rule K-1(b)(3)(B) imposes as a pre-condition for the operation of a digital asset mining business a requirement that the business "establish[] that the business is not a prohibited foreign-party-controlled business as defined by and in accordance with Ark. Code Ann. § 14-1-606." Rule K-2(e)(7) requires submission of a "notarized affidavit certifying" compliance with Ark. Code Ann. § 14-1-606 as part of the application for a permit.

The federal government, not the Arkansas Oil and Gas Commission, governs foreign affairs. The Arkansas Oil and Gas Commission cannot promulgate rules that conflict with or otherwise implicate the federal government's foreign affairs powers. Additionally, the Arkansas Oil and Gas Commission cannot promulgate rules that conflict with the provisions of federal law, including the operations of the Committee on Foreign Investment in the United States ("CFIUS"), as statutorily codified by the Foreign Investment Risk Review Modernization Act of 2018 ("FIRRMA"). Nor can the Arkansas Oil and Gas Commission promulgate rules that conflict with the statutory definitions of foreign ownership and foreign control set forth in the International Traffic in Arms Regulations ("ITAR").

22. Rule K-1(b)(3)(B) and K-2(e)(7) are unconstitutional.

Rules K-1(b)(3)(B) and K-2(e)(7) facially discriminate based on alienage while not being narrowly tailored to serve a compelling governmental interest. They discriminate or invite discrimination based on race and national origin while not being narrowly tailored to serve a compelling governmental interest. They violate the right to due process of law. They impermissibly favor in-state commerce and discriminate against interstate and foreign commerce in violation of the commerce clause. As to existing operations, they threaten takings of private property without affording any compensation to existing operators.

4906-4539-3679.1

Docusign Envelope ID: 8AAE45D0-93D5-4C6B-8CD2-F93EBA396416

23. <u>The look-back period in Rule K-4 should be modified</u>.

      The look-back period for determining previous violations under Rule K-4(e)(2)(B) and under Rule K-4(e)(3)(B) is unreasonable and should be changed to two (2) years, instead of five (5) years.

                  Respectfully submitted,

                  Arkansas Cryptomining Association
                  320 S. Izard Street
                  Little Rock, AR 72201

              By: *Edward L. Holcomb*
                  Edward L. Holcomb
                  edwardlholcomb@gmail.com

4906-4539-3679.1

## RESPONSIVE SUMMARY FOR OGC GENERAL RULE K PROMULGATION

Comes now the Oil and Gas Commission (OGC), by and through Kesia Morrison, Chief Counsel of the Department of Energy and Environment, and provides this Responsive Summary as required under Ark. Code Ann. § 25-15-204(g)(1)(C)(ii)(c).

## I. INTRODUCTION

The public comment record for the promulgation of General Rule K contains nine (9) written comments received by the OGC and two (2) oral comments made at the public hearing on January 6, 2025, pertaining to the promulgation of General Rule K regarding the rules regulating digital asset mining.

The Notice of Rule Change was published on December 14, 15, and 16th, 2024, in the Arkansas Democrat-Gazette, and was posted in the Arkansas Register. The Oil and Gas Commission conducted one (1) public hearing on the proposed promulgation of General Rule K in North Little Rock, Arkansas, on January 6, 2025. The public comment period ended on January 13, 2025, at 11:59 p.m. (Central Time).

## II. RESPONSES TO WRITTEN COMMENTS

The following people or organizations made written comments during the public comment period:

**Commenter:  Robert Reynolds**

**Comment:**    Concerns with the depletion of the freshwater aquifers located in Arkansas because of operations by digital asset mining businesses.

**Response:**    The Arkansas Oil and Gas Commission (AOGC) acknowledges the comment. Proposed General Rule K-2 e) 6) provides appropriate restrictions on the negative impact to the local water supply. In regard to groundwater concerns, AOGC defers to the Arkansas Natural

**EXHIBIT**

**4**

Page **1** of **21**

Resources Commission (ANRC), which is the agency that has the statutory authority to regulate groundwater usage, availability, and quality.

**Commenter: Kim Troboy (Written comment of January 13, 2025, and oral comment at hearing of January 6, 2025.)**

**Comment:**    These permit regulations should apply to any free-standing data center, not just the so-called cryptocurrency 'mines' or 'digital asset mining businesses'. Otherwise, Arkansas will in future face the same threats but without the regulations and safeguards proposed by this agency.

I have no such concern about data centers created to support businesses in Arkansas engaged in regular retail, transportation or other businesses. I have observed the operations of data centers in businesses such as Walmart, ArcBest, Acxiom, and Dillard's. These data centers have proved themselves to be good actors and present no threat to Arkansas.

Justification

The equipment in these operations may easily be switched over to providing artificial intelligence (AI) cloud operations by simply loading different software and data. This conversion takes very little time to accomplish. AI cloud operations will contain the very same equipment and use the very same amount of electricity and water (if not more). AI cloud operations host AI agents, their knowledge bases, and the products of their work in terms of text, images, music, software, and other artifacts they produce.

In that case, these very same operations will contain the very same equipment and present the very same threats to public peace, health, and safety, but they will become completely unregulated.

In fact, as an industry, 'digital asset mining businesses' do not have an infinite lifespan at the present level of profits. In fact, the Microsoft AI search agent states,

"As of now, approximately 19.1 million bitcoins have been mined. However, the total number of bitcoins that will ever exist is capped at 21 million. This means there are still about 1.9 million bitcoins left to be mined." (Citing How Many Bitcoin Are There? How Much Supply Left to Mine?)

After this milestone is reached, there will still be blockchains of bitcoin transactions to validate, but the opportunity for large profit margins will be much reduced. Anyone investing this much capital in this sort of business should know this fact and should be looking for alternative ways to deploy their investment more profitably. AI cloud operations would be a very profitable business to move into with a much longer operational time frame.

Legal Basis

The initial Act 851 that allowed blockchain validation operations to conduct business in the State of Arkansas was titled "ARKANSAS DATA CENTERS ACT OF 2023". Stated within that act (highlighting mine):

"14-1-502. Legislative findings and intent.

(a) The General Assembly finds that:

(1) The data centers industry began its modern version in the 1980s, and the industry has seen accelerated growth since 2008;

(2) Data centers have seen global growth with the expansion of bandwidth, the need for analytical data research, and digital currency;

(3) Data centers, digital currency, and blockchain technology are legal in all fifty (50) states; and

(4) Guidance for future industry growth is needed in Arkansas to protect Arkansans from fraudulent business practices.

"14-1-505. Discrimination against digital asset mining business [is] prohibited."

(a) Except as provided by subsection (d) of this section, a local government shall not:

(1) Enact or adopt an ordinance, policy, or action that limits the sound decibels generated from home digital asset mining other than the limits set for sound pollution generally;

(2) Impose a different requirement for a digital asset mining business than is applicable to any requirement for a data center;

(3) Rezone an area in which a digital asset mining business is located without complying with applicable state law and local zoning ordinances; or

(4) Rezone an area with the intent or effect of discriminating against a digital asset mining business.

In 2024, this act was amended by Act 174 and Act 173 so that most of section 14-1-505 above was struck to restore the ability of local governments to enact ordinances regarding so-called 'digital asset mining business'.

Note that section 14-1-502 was not amended by Act 174 or Act 173.

Both Act 173 and Act 174 were passed with an emergency clause that is significant here.

Act 173:

SECTION 9. EMERGENCY CLAUSE. It is found and determined by the General Assembly of the State of Arkansas that increased circulation of digital currency and adoption of digital transformation have led to an influx of digital asset mining businesses in Arkansas in recent years; that digital asset mining businesses have potential to generate excessive noise and that without adequate regulation, digital asset mining businesses can place a strain on, and reduce the quality of life of, residents and communities near them; and that growth of this business sector has been capitalized upon by upon by foreign corporations and other foreign entities and aliens that pose potential threats to the welfare and safety of Arkansas and its residents. Therefore, an emergency

is declared to exist, and this act being immediately necessary for the preservation of the public peace, health, and safety shall become effective on [etc.]

Act 174:

SECTION 8. EMERGENCY CLAUSE. It is found and determined by the General Assembly of the State of Arkansas that digital asset mining businesses present significant threats to the public peace, health, and safety, including without limitation significant noise emissions, massive power consumption, the use of large quantities of water that potentially threatens water resources, and potential issues with cybersecurity; that the continuous noise emitted by digital asset mining businesses threatens the public peace, health, and safety as it risks potential damage to the hearing and quality of life of the citizens of this state; that in light of these threats it is imperative that the General Assembly regulate by permit digital asset mining businesses to protect the public peace, health, and safety; and that this act should become effective at the earliest opportunity to begin the regulatory process and protect the citizens of the state from any harmful actions related to digital asset mining businesses. Therefore, an emergency is declared to exist, and this act being immediately necessary for the preservation of the public peace, health, and safety shall become effective on: [etc.]

Therefore, Arkansas will be faced with these very same threats, unprotected by regulations, if this agency does not include other types of free-standing data centers in these proposed regulations.

**Response:**   AOGC acknowledges the comment. AOGC regulates digital asset mining businesses as defined in Ark. Code Ann. § 23-119-102(2) and lacks the statutory authority to regulate all data centers.

**Comment:**   In Rule K-2, section (e), (7), the issue of ownership by a prohibited foreign owner is addressed. I realize that this issue is being litigated in the courts. However, I do want to point out that a colleague, Maj. Gen. Bill Harmon, who spent his career in U.S. Army intelligence, was able to investigate a number of existing facilities and discover Chinese or Chinese Communist Party ownership well-hidden further up a shell game of ownership. In addition, the equipment and software may easily be leased from Chinese sources by an American citizen. This is a significant security threat to the entire United States, including the electrical grid, nuclear power plants, and anything else remotely linked to the Internet. If you watched 60 Minutes last Sunday, the outgoing FBI director declared China the number one security threat to the United States for these very reasons. I beg of you to not leave our security up to a "notarized affidavit". We have cybersecurity expertise in the Arkansas Division of Information Systems and in some of our state universities. Take advantage of them.

**Response:**   AOGC acknowledges the comment. Under Ark. Code Ann. § 14-1-606(d), the Attorney General has the authority to investigate any complaints pertaining to illegal ownership.

**Comment:**   The permit application should contain a plan for how the business will dispose of the computer equipment used in these operations. Whether the equipment is removed from the business in small units over time or as a whole if the business is shut down, this equipment poses a significant risk in our landfills and to our water sources should the equipment wind up in a landfill.

This agency should require each business to present a detailed plan on how the equipment will be disposed of or, preferably, recycled and apply significant fines should this plan not be executed as approved. Since dissolution of a business may provide the means by which an operator may avoid such requirements and fines, perhaps a bond should be required to solve the problem if the owner does not execute the plan appropriately.

**Response:**    AOGC acknowledges the comment. AOGC lacks explicit statutory authority to regulate disposal of solid waste, disposal of hazardous waste, and reuse of recovered materials. The Arkansas Department of Energy and Environment, Division of Environmental Quality (DEQ) is currently authorized by statute and regulation to investigate and compel compliance with requirements for disposal of solid waste, disposal of hazardous waste, and reuse of recovered materials. *See* Ark. Code Ann. § 8-6-201 et seq., Ark. Code Ann. § 8-7-201 et seq., 8 CAR § 60-101, and Arkansas Pollution Control and Ecology Commission (APC&EC) Rule 23 (not yet codified).

**Comment:**    The Oil & Gas Commission should require Entergy to report energy usage to either this agency or the Public Service Commission by these businesses on a regular basis. Many users received higher than usual bills from Entergy near the end of last year, citing need to buy power on the open market at higher rates. Without timely reports from Entergy, it may not be possible to determine whether increased usage by digital asset mining businesses caused the need for such purchases. Certification from Entergy (or a water utility) may not stand the test of time. Entergy should be held accountable in this. The only way to do that is for the data to be available to the Commission (or Public Service Commission). In many other locations where these businesses have operated, retail customers experience significantly higher costs for electricity.

Microsoft's Copilot states,

"Bitcoin mining has indeed led to higher electric rates for retail customers in some areas. For example, a study from the University of California, Berkeley, found that in upstate New York, cryptocurrency mining operations increased annual electric bills by about $165 million for small businesses and $79 million for individuals. This was due to the high energy demands of mining operations, which can consume large amounts of electricity (1).

In other regions, such as parts of China, the influx of crypto miners has also driven up electricity costs, leading to rationing and higher rates for other industries and residents. (2)"

1. Power-hungry cryptominers push up electricity costs for locals - Haas News | Berkeley Haas

2. https://www.chicagobooth.edu/review/why-youre-paying-bitcoins-energy-bill"

And

"Energy consumption and environmental concerns are indeed significant factors behind the restrictions on Bitcoin mining in Russia and China. However, there are also other reasons, including economic and geopolitical factors.

In Russia, the government has implemented seasonal restrictions and outright bans in certain regions to balance energy demands and maintain grid stability (2). Despite legalizing Bitcoin mining in late 2024, Russia has imposed these measures to manage energy resources effectively and maximize tax revenues (1).

China, on the other hand, banned Bitcoin mining entirely in 2021 due to concerns about energy consumption, financial risks, and environmental impact. The Chinese government aimed to reduce carbon emissions and maintain financial stability by cracking down on cryptocurrency activities (1).

1. Crypto Regulations in Russia: Geopolitical Factors Behind the Move – OneSafe Blog

2. Russia bans crypto mining for 6 years in 10 regions

In Arkansas, we need to deal with this issue in advance. We can at least preserve data that will allow us to determine whether these operations are a significant cause behind higher utility costs.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Comment:**    In Rule K-2, section (e), part (4), there is a requirement for a map within a two-mile radius of the 'mining' facility. While I realize this size area may flow from one of the legislative acts covering these businesses, I suggest that you may need more than a two-mile radius in hilly or mountainous areas. In Moreland, where two of these facilities are operating, polluted water may easily and quickly flow downhill more than two miles because of the force of gravity and the terrain. If you wish to protect these citizens and their livestock, perhaps a larger radius of five miles is more appropriate. In addition, you may wish to include more than just residences. There may be farms, churches, schools, fire departments, and other types of entities located within this radius that may be affected. This also applies in Rule K-2, section (e), part (C) (i). There may be other types of structures in the vicinity of where a proposed operation will be located, such as churches, clubs, and so forth.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Comment:**    In Rule K-2, section (e), part (6), I'd like to point out that in many rural areas, there may be many residences, farms, and other entities on well water and dependent on the local water supply. They are not likely monitored by a water utility or a private owner of a well offering to supply a 'mining' operation with water. How are these citizens protected here?

**Response:**    AOGC acknowledges the comment. General Rule K-2 e) 6) provides appropriate restrictions on the negative impact to the local water supply. In regard to groundwater concerns,

AOGC defers to ANRC, which is the agency that has the statutory authority to regulate groundwater usage, availability, and quality.

**Comment:** In Rule K-2, section (f), part (1), the proposed regulations call for notice to be placed in a newspaper. While I realize this sort of publication has been used traditionally for legal notice purposes, the number of Arkansans who pay for subscriptions to any newspaper has dropped precipitously in recent times.

It would serve the public far better today if such notices were placed prominently on state websites and state social media sites. It's time for a change.

For example, despite considerable public concern over bitcoin 'mining' operations, only one person (myself) spoke at the Commission Public Hearing. This is likely due in part to Arkansans getting their news mostly from the Web and social media now. Both of these sources are free, and many Arkansans feel that they cannot afford newspaper subscriptions these days.

The Public Notice for the Public Hearing was somewhat obscure and buried somewhat at the Oil & Gas Commission webpage, enough so that an ordinary citizen could easily have difficulty finding it. It took me some time to find it after I was informed it was there. As I pointed out earlier, rates of Web and social media participation have gone up dramatically while subscriptions rates to newspapers have been falling just as dramatically. I encourage all government agencies to respect where citizens expect to see news by posting notices prominently on their websites and on several social media platforms.

**Response:** AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Comment:** In Rule K-2, section (e), part (8), (C), again, there may be structures other than residences or commercial use within 2,000 feet of the facility. There may be churches, first-responder facilities, clubs, or other types of structures.

**Response:** AOGC acknowledges the comment but has determined that no changes to the rule are warranted. AOGC structured its rule to correspond with the language in Ark. Code Ann. § 14-1-604(b)(3)(C).

**Comment:** In Rule K-2, section (f), part (1), and part (2) (C) the regulations call for all surface owners of record within one mile of the mining facility should receive notice by mail at least 45 days prior to filing the application. As described above, if the terrain is hilly or mountainous, this radius should be expanded to at least three miles in the downhill watershed area below the facility. They could easily be affected by polluted water moving quickly downhill.

**Response:** AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Comment:** In Rule K-2, section (f), part (3), (D), there is no time frame for an applicant to deliver a copy of the application to and interested party who has requested a copy. It may be in the interest of the applicant to delay such a delivery. I recommend the Commission set a reasonable length of time within which the applicant must deliver that copy.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Comment:**    As you may have noticed, I have continually referred to these facilities as 'mining' operations using single quote marks. This is language from the Blockchain Council that has been picked up in popular articles and commentary. In reality, they are Bitcoin Blockchain data validation operations. No other cryptocurrency needs the computing power these operations require, as they use other methods. I also want to point out that our legislature also adopted the term 'digital asset' from the Blockchain Council, despite the fact that there are many, many other forms of digital assets. A few other forms of digital assets include AI and AI artifacts, virtual reality (platforms, objects, and worlds), and images used by corporations on the Web (icons, logos, etc.).

These sorts of definitions allow and industry to protect themselves and limit the scope of legislation and to deceive and confuse legislators and citizens. I do wish the Arkansas Legislature had taken the time to consult more neutral experts regarding the terms used. Such experts could have informed them about many hazards and against the self-dealing tactics of the industry

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted. AOGC regulates digital asset mining businesses as defined in Ark. Code Ann. § 23-119-102(2) and lacks the statutory authority to regulate all data centers.

### Commenter:  Kenneth Graves (Oral comment at January 6, 2025, hearing)

**Comment:** Mr. Graves appeared at the hearing and requested a copy of Rule K.

**Response:** OGC staff provided a copy of Rule K to Mr. Graves.

### Commenter:  Leah Acoach

**Comment:**    I am writing pursuant to the comment period related to potential crypto regulations. First and foremost, the citizens and residents of Arkansas should always be given priority to water and electrical capacity before these operations. That should be the primary goal. Secondarily, any strain on utility system should not be equally shared by all who utilize but rather if these businesses are drawing a significant enough load to endanger the supply, any increased burden for capacity should be placed on those businesses. Additionally, existing industry should not be hampered by the introduction of one of these businesses entering the area in which the industry operates. My primary concern in this regard is agriculture. These businesses are notorious for overuse of the utility systems, and we must make certain that no agricultural operations are going to be impacted by their introduction. Lastly, the noise generated by these businesses must be contained as to not impact the quality of life for residents or wildlife alike.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

### Commenter:  Faith Petit-Shah

**Comment:**    I am very concerned that NO ONE is paying attention to the true costs of Crypto. It's not fair that Arkansas citizens ultimately pay for the profit of a very few. Crypto should be

forced to pay much higher rates for the electricity usage. But more than that... crypto is extremely harmful to our fragile environment. The industry should be FORCED to generate their own electricity. Period. Think of the future.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Commenter: James Babb**

**Comment:**    Thank you in advance for your consideration in the following K1 crypto mining changes: Our company name is True North Computation(Juice-Tech Inc.} We currently have 3 Existing mining facilities in Arkansas. Our locations are: 1)Little Rock 2)Newport 3)Walnut Ridge I would like to submit the following comment per the window for public comment period, and would hope the Oil and Gas Commission would consider making changes per the following: Rule K2;d)2)c)- states that a mining facility must provide notice by mailing to All surface owners of record within one (1) mile of the mining facility. The above mentioned rule will require our company to send to approximately 1,000 surface owners per each of our (3) locations. *please note the google earth map reference for our Walnut Rodge location attached. The purple lines suggest your proposed 1 mile radius and the surface owners. The yellow lines suggest a 1/2 mile radius and the reduction in surface owners. ** also note that the above referenced google earth map was prepared by the Walnut Ridge Mayor (Charles Snapp) and myself. Mayor Snapp and I feel that for our existing crypto mining locations, that the following 2 modifications should be considered as the level of noise has not been an issue of concern to surface owners or local government officials outside the 2,000 feet perimeter of our mining facilities. 1) Decreasing the notification mailing to 2,000 feet, referencing 1 the Oil & Gas Commissions above noted rule K2;c)8)i) 2) Completely doing away with the surface owner notification process for All Existing Crypto Mining Facilities. Thank you again for your consideration of change.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Commenter: John Whiteside**

**Comment:**    I am requesting that energy usage disclosure be required for all digital mining asset operations. Citizens should have the right to know how much electricity is being used by these operations and the ability to access that information via a public website maintained and hosted by the Oil & Gas Commission under the Rule-K regulations. Transparency and straightforward disclosure of these operations will go along way in building trust with the citizens of Arkansas. The proposed rules state that regulations will ensure these digital asset mining operations "cannot stress electrical utility capabilities." Public disclosure of each operation's annual total energy/electricity usage will help ensure the commission achieves this· stated goal of their proposed regulations. The citizens of Arkansas deserve the right to know how these operators impact the electrical grid that we all share and pay to maintain.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Commenter: Tami Hornbeck**

**Comment:** With the contentious nature of this industry and effects on surrounding property values there should be more notice of facilities desiring to locate in a community with public notice in local news media and social media sites, along with public hearings at least 90 days prior to locating in an area. The radius needs to be further than a mile as these facilities have impact much farther than a 1 mile radius.

**Response:** AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Comment:** Regardless of the type of facility ... whether immersion cooled or water cooled, totally enclosed or not and regardless of location there should be a decibel threshold within levels to maintain the health and safety of people, pets, livestock and wildlife located in the area of the facility.

**Response:** AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Comment:** With impacts to local grids and water supplies these facilities should be required to report the quantity of electricity provided to them in MW, as well as their water source and usage to ensure it doesn't threaten local water supplies.

**Response:** AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Comment:** The permits should have to be renewed annually and facilities should be inspected without notice by the Oil and Gas and ADEQ. If a facility wishes to expand, public hearings and permit application must be repeated.

**Response:** AOGC acknowledges the comment but has determined that no changes to the rule are warranted. DEQ has inspection authority as set out in its applicable rules and statutes. In accordance with Ark. Code Ann. § 23-119-105, AOGC can inspect digital asset mining businesses upon complaint.

General Rule K-2 d) gives AOGC the ability to issue permits that are not in excess of a five-year term. AOGC has regulatory authority to revoke a permit once issued, pursuant to General Rule K-2 j), for non-compliance with applicable statutes or laws. These provisions allow AOGC the sufficient ability to regulate a permit holder until a permit renewal application is required or if non-compliance with a current permit is an issue.

AOGC will consider expansions of a facility on a case-by-case basis to determine if a new permit application process will be required.

**Comment:** These facilities must be required to properly dispose of the immersion cooling liquid, waste water and recycle the massive amounts of electronic equipment (computers) to a pre-approved facility that can handle this volume. Local recycling facilities and landfills shouldn't be overwhelmed with this equipment nor subjected to the hazards it proposes. They should also receive approval and be permitted for their cooling liquid/water disposal and sites tested several times a year for compliance.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted. AOGC lacks explicit statutory authority to regulate disposal of solid waste, disposal of hazardous waste, and reuse of recovered materials. DEQ is currently authorized by statute and regulation to investigate and compel compliance with requirements for disposal of solid waste, disposal of hazardous waste, and reuse of recovered materials. *See* Ark. Code Ann. § 8-6-201 et seq., Ark. Code Ann. § 8-7-201 et seq., 8 CAR § 60-101, and APC&EC Rule 23 .

**Comment:**    These facilities should positively impact the community in which they are located instead of taking away quality of life for area residents and negatively impacting property values and local economies.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Commenter:  The Arkansas Cryptomining Association**

**Comment:**    The Commission should adopt a reasonable transition rule for existing facilities to apply for a permit.

Rule K-1(b)(2) prohibits existing digital mining asset businesses from operating unless they apply for a permit within 90 days after Rule K is promulgated. However, Rule K-2(f)(1) and (2) require that a digital asset mining business publish a public notice and provide mailed notice to certain parties "at least forty-five (45) days prior to filing the application with the Commission." In addition, Rule K-2(f)(3)(D) requires that during this 45-day pre-application public notice period that the applicant must "deliver the application to [an] interested party as directed by the Commission."

As a practical matter, for existing digital asset businesses this process requires that a final permit application be ready and available to the public within 30 to 40 days after the rule becomes final, at the risk of being deprived of the right to operate if the public notice is not published within 45 days before the 90-day application deadline. Furthermore, some required application items such as the electric and water utility certifications required by Rule K-2(e)(5) and (6), and the technical schematic and engineering specifications in Rule K-2(3)(8), may not be readily available during such a short time period. The rule does not contain a mandate for electric or water utilities to make such a certification; nor is there a time limit for the utilities to do so.

At a minimum the Rule should include a process for existing facilities to obtain extensions of time for the 45-day public notice deadline and the 90- day permit application filing deadline.

**Response:**    AOGC acknowledges the comment. AOGC has has proposed amendments to the rule to address the 45-day public notice timeframe. Section 7 of Act 174 of the 2024 Fiscal Session addresses the permitting processes and requirements for existing facilities. Additionally, the Applicant and AOGC could enter into a voluntary enforcement agreement, or the Applicant could file an application under applicable hearing procedures, to extend the public notice deadline.

**Comment:**    The ability to operate should not be conditioned on compliance "with all local government ordinances."

Rule K-1(b)(3)(C) requires that in order to operate, a digital asset mining business must maintain compliance with all local government ordinances. This is overbroad, since it effectively delegates veto power over the ability of a digital asset mining facility to operate to a local governmental body, regardless of whether a particular local ordinance is related to any aspect of Rule K, or the statutes governing digital asset mining. Moreover, this could result in uneven development and regulation of cryptomining across the state.

This Rule should provide that contrary provisions of local government ordinances and regulations are preempted by the issuance of a Commission permit.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted. Pursuant to Ark. Code Ann. § 23-119-105(a), AOGC has jurisdiction of and authority over all persons and property necessary to administer and enforce effectively the Arkansas Digital Asset Mining Business Act (Ark. Code Ann. § 23-119-101, et seq.) and the Arkansas Data Centers Act of 2023 (Ark. Code Ann. § 14-1-601, et seq.). Specifically, Ark. Code Ann. § 14-1-604(a)(1) provides that "[a] digital asset mining business may operate in this state if the digital asset mining business complies with [a]ny ordinance." AOGC promulgated rules that conform to this statutorily defined requirement.

**Comment:**    Prohibiting digital asset mining businesses from operating based on non-compliance with other ordinances and state and federal laws is overbroad and discriminates against digital asset mining businesses.

Rules K-1(b)(3)(C) and (E) are overbroad and discriminate against digital asset mining businesses by conditioning authority to operate on maintaining compliance with all local government ordinances and all applicable state and federal laws. Other ordinances and laws have their own enforcement, penalties, and compliance mechanisms that are tailored to the specific ordinance or law at hand and that are deemed effective to compel compliance; however, this provision of Rule K adds on top of those penalties and compliance regimes, the prospect that digital asset mining businesses would not be able to operate based on "non-compliance" with any such an ordinance or law. Any determination of non-compliance should be made only through the existing enforcement mechanisms and limited to the prescribed penalty, under the applicable local governmental ordinance or applicable state or federal law, not through a separate determination by the Commission.

Furthermore, this provision is discriminatory because it only applies to digital asset mining businesses, and other types of businesses that may be in non-compliance with a local ordinance or state or federal law are not faced with the prospect of not being able to operate even though they may be in non-compliance.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted. Pursuant to Ark. Code Ann. § 23-119-105(a), AOGC has jurisdiction of and authority over all persons and property necessary to administer and enforce effectively the Arkansas Digital Asset Mining Business Act (Ark. Code Ann. § 23-119-101, et seq.) and the Arkansas Data Centers Act of 2023 (Ark. Code Ann. § 14-1-601, et seq.). Specifically, Ark. Code Ann. § 14-1-604(a) provides that "[a] digital asset mining business may operate in this state if the digital asset mining business complies with [a]ny ordinance . . . [and] [s]tate and federal law." AOGC promulgated rules that conform to these statutorily defined requirements.

**Comment:**    The Rule should clarify that local regulation of digital asset mining businesses is limited to areas of regulation that are not addressed by state or federal law or the Commission's rule, and that local regulation of digital asset mining businesses must be consistent with federal law, state law, and the Commission's rule.

Rules K-1(c)(10) and (13) define "Legislative body" and "Ordinance" respectively for purpose of Rule K. "Ordinance" is defined to include "appropriate" enactments; however, it does not define what is "appropriate." Consistent with Ark. Code Ann. § 23-119-105(f), "appropriate" should be defined to mean (a) matters or areas of regulation not already addressed by federal law, state law or the Commission's rules and (b) legislative enactments that are consistent with federal law, state law or the Commission's rules. In addition, in Rule K-1(c)(13) the word "appropriate" should modify the words "ordinance" and "resolution" as well as "other legislative enactment of a legislative body."

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted. The terms defined in General Rule K-1 c) 9) and 13) conform with the statutory definitions of "legislative body" and "ordinance" found in Ark. Code Ann. § 14-1-603(7) and (10).

**Comment:**    The Rule should only regulate persons who have actual control over a digital asset mining business.

Rule K-1(c)(15) defines "regulated entity" as "any person associated with a mining facility, a digital asset miner, or a mining facility." (emphasis added). Rules K-4(b), (c), (d) and (e) subject a "regulated entity" to enforcement action by the Commission. This Rule is overbroad. There is no definition of "associated with" and consequently the Rule provides the Commission with authority to take enforcement action against service providers, investors, finance companies, accountants, attorneys and many other types of individuals who have some connection with a digital mining asset facility. The term regulated entity should be limited to persons with actual control over the digital asset mining facility. In addition, the definition repeats the phrase "mining facility," which is redundant.

**Response:**    AOGC acknowledges the comment and has proposed amendments to the rule to address the concerns.

**Comment:**    The Rule lacks an effective mechanism to compel electric and water utilities to certify the impacts of a digital asset mining business.

Rules K-2(e)(5) and (6) require a digital asset mining business as part of the application for a permit to provide a copy of an agreement with an electric power supplier or a water supplier or utility that certifies that the use of electricity will not negatively impact the local electric grid or the local water supply or increase electric costs or water rates to local customers. However, the Rule does not require an electric utility or water utility to prepare and provide such a certification; consequently, it may be impossible for a digital asset mining business to comply with this permit application requirement, and for existing digital asset mining businesses to comply in a timely manner to meet the 90-day requirement for filing a permit application.

This permit application requirement is outside the effective control of a permit applicant, and may be subject to the regulatory authority of other state agencies, including but not limited to the Arkansas Public Service Commission. The Rule does not contain provisions, nor does the Rule identify the source of the Commission's authority, to require electric and water suppliers to provide such certifications to a permit applicant in a timely manner.

The Rule does not provide any definition of "negatively impact" to guide digital asset mining businesses or electric utilities or water utilities in making such an assessment.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Comment:**    The Rule should not limit the types of noise-reduction techniques that may be used.

Rule K-2(e)(8) as written requires a digital asset mining business to include in its permit application technical information for one of three types of noise reduction techniques – (1) liquid or submerged cooling; (2) full enclosure with material reasonably calculated to reduce noise emissions; or (3) passive cooling without complete enclosure for a location at least 2000 feet away from the nearest residential or commercial structure, or in an area zoned for industrial or other approved use. However, Ark. Code. Ann. § 14-1- 604(b)(3) does not limit noise-reduction techniques to those three possibilities. That provision states that a digital asset mining business must apply "noise-reduction techniques", but does not limit such techniques to those three possibilities. The Rule should clarify that other techniques and technology may be used to meet statutory requirements, for example noise easements or licenses, noise canceling technology, etc.

Furthermore, the Rule is arbitrary in that for fully enclosed systems it only requires use of material reasonably calculated by industry standards to reduce noise emissions to a level acceptable to a reasonable person, but for passively cooled systems the digital asset mining facility must relocate at least 2000' feet from a residential or commercial structure or an industrial zoned area, even if the passively cooled system reduces noise emissions to a level acceptable to a reasonable person. Because the purpose of the Act is to "reduce noise emissions to a level acceptable to a reasonable person", and because digital asset mining facilities may be able to satisfy that purpose even if located closer than 2000' feet from a residence, the 2000' setback requirement or location in an industrial zoned area is arbitrary.

Furthermore, the Act distinguishes home digital asset mining from a digital asset mining business, and appears to allow home digital asset mining in residential areas without having to apply noise reduction techniques or to "reduce noise emissions to a level acceptable to a reasonable person."

In addition, the Rule should provide a longer transition period for existing facilities to come into compliance with the requirement to install noise-reduction techniques or relocate existing facilities to approved locations. Furthermore, the technology requirements in Rule K should not apply to facilities constructed before the effective date of the Arkansas Data Centers Act, Ark. Code Ann. §§ 14-1-601, et seq., which preempts any contrary provision under the Rule.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted. The wording of General Rule K-2 e) 8) is patterned after the statute and does not include any limitation that is not in Ark. Code Ann. § 14-1-604(b)(3).

**Comment:**    The Rule should adopt the same regulatory scheme as used for sound levels generated by gas compressor facilities. See Ark. Code Ann. § 15-71-110; General Rule D-20 ("Noise Level Requirements for Non-Wellhead Compressor Facilities").

Commission Rule D-20 regulates noise from natural gas compressor stations and does so by defining "noise sensitive areas" and then determining compliance with the noise standard from the nearest point of a "noise sensitive area" at the time of the construction of the facilities. See Rule D-20 (c) and (d).

Under that regulatory regime, "noise sensitive area" is defined as "a building with an established mailing address that is being utilized as a private residence, school, hospital, church, nursing home, or other building of a type that is regularly used for overnight accommodation." Rule D-20(b)(3).

The Commission should consider adopting a time-weighted noise standard for Rule K that would protect against significant harm to public health and safety or damage to property, and a similar compliance regime as Rule D-20 by defining "noise sensitive area" and demonstrating compliance with the noise standard at the boundary of the noise sensitive area at the time of construction.

Rule D-20(c) provides that the sound levels should be "measured from the exterior of the nearest noise sensitive area at the time of commencement of initial construction of the non-wellhead compressor facility or station." (emphasis added).

For the same reasons discussed above, the purpose of the Rule, in part, is to keep sound levels from the mining facilities at a level acceptable to a reasonable person. Therefore, the Rule should prioritize actual individuals, not structures. Currently, the Rule is overbroad in this respect and would encompass areas where people are not necessarily present. For example, under the current Rule, mining facilities would be prevented from locating next to abandoned "residential" or "commercial use structures." Moreover, there are several "commercial use structures" located in Arkansas that would be louder than digital asset mining facilities.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted. The statute contains specific requirements for noise reduction techniques. *See generally* Ark. Code Ann. § 14-1-604. The rule that is proposed fully implements the legislative requirements.

**Comment:**    Rule K-2(f)(3) should be re-written to make the time frame for public notice of a permit application consistent with the time frame for filing that permit application with the Commission.

Rule K-2(f)(3) does not make sense. It requires publication of a notice stating that the permit application may be obtained from the Commission 45 days before the application is required to be filed with the Commission per Rule K-2(f)(1). The rule should be rewritten to require public notice of the application at the time the application is filed with the Commission, or to delete the language stating that a copy of the permit application may be obtained from the Commission.

Page **15** of **21**

**Response:**    AOGC acknowledges the comment and has proposed amendments to the rule to address the concerns.

**Comment:**    If no objections are received for a permit application and the application is complete, the permit should be issued without referral to the Commission.

Rule K-2(g)(2) provides that the Director may refer a permit application to the Commission under certain circumstances even if the application is administratively complete and no timely objections have been received. If no timely objection has been received and the application is complete and complies with statutory requirements, the Director should be required to issue the permit.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Comment:**    The Rule should have a time deadline for issuing a non-controverted permit, and to take final action on a controverted permit.

Rule K-2(h) states that if the applicant satisfies the requirements of all applicable statutes and Rule K, then a permit shall be issued. For a non- controverted permit application, the permit should be issued within 30 days after the permit application is filed. For permit applications referred to the Commission, the permit should be issued or denied within 120 days after the permit application is filed.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Comment:**    The issuance of a permit should act as a shield.

The Rule should clarify that issuance of a permit should act as a shield, e.g., a complete affirmative defense against a lawsuit brought under Ark. Code Ann. § 14-1-604(g).

Alternatively, a complainant should be required to exhaust administrative remedies by filing a complaint with the Director under Rule K-4(d), before initiating a lawsuit under Ark. Code Ann. § 14-1-604(g).

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Comment:**    The rule should clarify that denial of a new or renewal permit application should not be based on failure to abate a violation of any statue or rule.

Rule K-2(h)(2) and (3) allows denial of a new or renewal permit if the applicant or other person with a five percent (5%) interest in the digital asset mining business has failed to abate any outstanding violation "of statutes or rules." This Rule exceeds the Commission's statutory authority.

Alternatively, this provision should be clarified that it is limited to failure to abate violations of the Arkansas Digital Asset Mining Business Act (Ark. Code Ann. § 23-119-101) or the Arkansas Data Centers Act (Ark. Code Ann. § 14-1-601), or regulations promulgated thereunder.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted. Pursuant to Ark. Code Ann. § 23-119-105(a), AOGC has jurisdiction of and authority over all persons and property necessary to administer and enforce effectively the Arkansas Digital Asset Mining Business Act (Ark. Code Ann. § 23-119-101, et seq.) and the Arkansas Data Centers Act of 2023 (Ark. Code Ann. § 14-1-601, et seq.). Specifically, Ark. Code Ann. § 14-1-604(a) provides that "[a] digital asset mining business may operate in this state if the digital asset mining business complies with [a]ny ordinance . . . [and] [s]tate and federal law." Given these provisions, this rule does not exceed AOGC's statutory authority.

**Comment:**    Permit denial should not be based on a history of violations of other statutes or rules by five percent (5%) owners of a digital asset mining business.

Rule K-2(h)(4) requires denial of a new or renewal permit if the Director determines that a person with an interest exceeding five percent (5%) of the digital asset mining business has "a history of violating any applicable statutes, Commission rules, permit condition or order of the Commission, the Arkansas Pollution Control and Ecology Commission, or any other state or federal regulatory agency." (emphasis added).

This provision, particularly with respect to the underlined phrases, is overly broad and over reaching. Furthermore, it exceeds the Commission's authority because is not authorized by statutes. Unlike the so called "non- compliance determination" provision of Pollution Control & Ecology Rule 8.204, there is no statute that authorizes such a far-reaching provision, like Ark. Code Ann. § 8-1-106. Even so, such a provision runs the risk of violating the constitutional right to freely associate because it is not narrowly drawn to achieve the goals of the authorizing statute.

Additionally, the term "history of violating" is undefined. As written, that phrasing suggests that even entities which have become fully compliant with all applicable statutes, rules, permit conditions, and orders could remain at risk of deprivation of existing uses of their property interests due solely to past non-compliance. The Commission should supply a definition of "history of violating" that includes a specific exception for previous compliance issues which have been substantially abated or this provision should be deleted.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Comment:**    Rule K should not allow revocation of a permit for violation of any other statute or law.

Rule K-2(j)(C) permits the Director to revoke a permit based on failure by the permit holder to meet any applicable statute or law. This provision should be clarified that "applicable" means the Arkansas Digital Asset Mining Business Act (Ark. Code Ann. § 23-119-101) or the Arkansas Data Centers Act (Ark. Code Ann. § 14-1-601). Otherwise, the provision is overbroad, raises the potential of interference with other regulatory agencies, and violation of the anti-delegation doctrine.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted. Pursuant to Ark. Code Ann. § 23-119-105(a), AOGC has jurisdiction of and authority over all persons and property necessary to administer and enforce effectively the Arkansas Digital Asset Mining Business Act (Ark. Code Ann. § 23-119-101, et seq.) and the Arkansas Data Centers Act of 2023 (Ark. Code Ann. § 14-1-601, et seq.). Specifically, Ark. Code Ann. § 14-1-604(a) provides that "[a] digital asset mining business may operate in this state if the digital asset mining business complies with [a]ny ordinance . . .[and] [s]tate and federal law." Given these provisions, this rule does not exceed AOGC's statutory authority.

**Comment:**    Rule K-2(j)(2) should contain a procedure for lifting the stay during a permit appeal.

Rule K-2(j)(2) allows a permit holder to appeal the Director's decision to revoke a permit. During the appeal process operation of a facility may not commence or continue. This is overly broad. For existing permits, the ability to operate should remain in effect during the appeal unless it is shown that continued operation during the appeal would cause significant harm to public health and safety or damage to property. (see Rule K-4(b)(1)(C)). For new permits, the stay should be lifted during the appeal if the stay would have adverse economic or financial impacts on the permit applicant and operation of the facility during the appeal would not cause significant harm to public health and safety or damage to property.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Comment:**    Transfer of a digital asset mining business permit should apply to the transfer of ownership or control of the digital asset mining facility – not to the transfer of an ownership interest in the digital asset mining business or facility.

Rule K-3 sets forth the procedure for transferring a digital asset mining permit. Rule K-3(b) states that the procedure applies to "all transfers of the interest of the permit holder, including…A change of ownership or membership in the corporate entity that operates the digital asset mining business [.]" This requirement is too broad and would apply to any change in the membership of a permit holder, regardless of whether that change could or would affect the ability to control or operate the facility, and regardless of whether that change involved a prohibited foreign party.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Comment:**    Rule K-3(f)(2) and (f)(4) are not clear, are vague and ambiguous, and do not make sense.

Rule K-3(f)(2) provides that the Director shall deny a permit transfer if "the Commission has not approved the transfer in accordance with paragraph e) above." However, Rule K-3 does not contain any requirement for Commission approval of a permit transfer; instead Rule K-3 contemplates that the Director will make a decision on transfer approval (see Rule K-3(k)), and that if the permit transfer is denied, the permit applicant can appeal to the Commission. Furthermore, paragraph e) referenced in Rule K-3(f)(2) contains no reference to Commission approval, but simply states broad requirements for the new permit holder. This provision should be deleted or clarified.

Rule K-3(f)(4) permits the Director to deny a permit transfer if "no other permits may be issued in accordance with paragraph e) above." Again, the provisions of paragraph (e) do not make any sense in connection with the phrase "no other permits may be issued." This subparagraph should be deleted or clarified.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Comment:**    Rule K-3(h) should be limited to the statutes that Rule K implements.

Rule K-3(h) should clarify that the reference in the first line to "any rules, statutes" is to the Arkansas Digital Asset Mining Business Act (Ark. Code Ann. § 23-119-101) or the Arkansas Data Centers Act (Ark. Code Ann. § 14-1-601), or a rule promulgated to implement a provision of those acts.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Comment:**    Rule K-3(l) should remove or modify the provisions regarding operation upon revocation of a permit transfer or appeal of denial of a permit transfer decision.

Rule K-3(l) allows the Director to revoke a permit transfer approval and requires a permit holder to cease operation upon notice from the Director. This is overbroad, unreasoned and is different from the permit revocation provision in Rule K-2(j)(2); no explanation of the reason for this difference is given. Rule K-3(l) allows the permit holder to appeal the Director's decision to revoke a permit transfer decision. During the appeal process operation of a facility may not commence or continue. Like the provision in Rule K-2(j) this is overly broad and unreasoned. For existing permits, the ability to operate should remain in effect during the appeal unless it is shown that continued operation during the appeal would cause significant harm to public health and safety or damage to property (see Rule K-4(b)(C)). For new permits, the stay should be lifted during the appeal if the stay would have adverse economic or financial impacts on the permit applicant and operation of the facility during the appeal would not cause significant harm to public health and safety or damage to property.

**Response:**    AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Comment:**    Rule K-1(b)(3)(B) and K-2(e)(7) are preempted by federal law.

Rule K-1(b)(3)(B) imposes as a pre-condition for the operation of a digital asset mining business a requirement that the business "establish[] that the business is not a prohibited foreign-party-controlled business as defined by and in accordance with Ark. Code Ann. § 14-1-606." Rule K-2(e)(7) requires submission of a "notarized affidavit certifying" compliance with Ark. Code Ann. § 14-1-606 as part of the application for a permit.

The federal government, not the Arkansas Oil and Gas Commission, governs foreign affairs. The Arkansas Oil and Gas Commission cannot promulgate rules that conflict with or otherwise implicate the federal government's foreign affairs powers. Additionally, the Arkansas Oil and Gas Commission cannot promulgate rules that conflict with the provisions of federal law, including the

operations of the Committee on Foreign Investment in the United States ("CFIUS"), as statutorily codified by the Foreign Investment Risk Review Modernization Act of 2018 ("FIRRMA"). Nor can the Arkansas Oil and Gas Commission promulgate rules that conflict with the statutory definitions of foreign ownership and foreign control set forth in the International Traffic in Arms Regulations ("ITAR").

**Response:**     AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Comment:**     Rule K-1(b)(3)(B) and K-2(e)(7) are unconstitutional.

Rules K-1(b)(3)(B) and K-2(e)(7) facially discriminate based on alienage while not being narrowly tailored to serve a compelling governmental interest. They discriminate or invite discrimination based on race and national origin while not being narrowly tailored to serve a compelling governmental interest. They violate the right to due process of law. They impermissibly favor in-state commerce and discriminate against interstate and foreign commerce in violation of the commerce clause. As to existing operations, they threaten takings of private property without affording any compensation to existing operators.

**Response:**     AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Comment:**     The look-back period in Rule K-4 should be modified.

The look-back period for determining previous violations under Rule K- 4(e)(2)(B) and under Rule K-4(e)(3)(B) is unreasonable and should be changed to two (2) years, instead of five (5) years.

**Response:**     AOGC acknowledges the comment but has determined that no changes to the rule are warranted.

**Commenter:  Bradley D. Barnes**

**Comment:**     In addition to regulating Arkansas's growing crypto mining industry, the Department of Energy and Environment and the Arkansas Oil and Gas Commission should regulate wind energy developers as well.

Please review the attached analysis of a typical wind project. My analysis references the Nimbus project, by Scout Clean Energy proposed for Carroll County, although the report is relevant to the discussion of wind energy statewide.

Wind development is a very short sighted land use decision, and poses an existential threat to the tourism industry of Arkansas, which added $9.9 billion to the state's economy in 2023. These proposed ridge-top turbines will be among the tallest available, and will be placed at the highest elevations in the Ozarks.

Why are developers so anxious to grant Arkansas such a wonderful opportunity? Investment tax credits on deals of this size return upwards of $100 million to their investors, per project. Wind developers do not care if they wreck the Ozarks and lay waste to Arkansas, because of their lucrative tax credits. The developers are offering only 'liquidated damages' to affected counties.

Page **20** of 21

Compared to the tax incentives the developers pocket, local counties get a penny on the dollar, sometimes less.

With no restrictions, it may be difficult to stop anyone from building a hog farm right next door, but hog farms are not taller than the Seattle Space needle. It would seem unthinkable to construct dozens and dozens of structures taller than the St. Louis Arch on ridge tops throughout the state, especially in the Ozarks. But developers are willing to do just that.

We need to stop Wind Farms from spreading like wildfire across the Ozarks.

(Attachment omitted)

**Response:**     AOGC acknowledges the comment but has determined that no changes to the rule are warranted. This comment is not germane to the rule.

Respectfully Submitted,

By: */s/ Kesia Morrison*
        Kesia Morrison
        Chief Counsel
        Department of Energy and Environment
        5301 Northshore Drive
        North Little Rock, Arkansas 72218
        (501) 682-0604
        kesia.morrison@arkansas.gov

# ARKANSAS REGISTER



## Transmittal Sheet
### Use only for **FINAL** and **EMERGENCY RULES**

Secretary of State
**Cole Jester**
500 Woodlane, Suite 026
Little Rock, Arkansas 72201-1094
(501) 682-5070
**www.sos.arkansas.gov**



**For Office Use Only:**

Effective Date _____ Code Number _____

Name of Agency  Oil and Gas Commission

Department  Department of Energy and Environment

Contact  Peter Alberg    E-mail  Peter.Alberg@arkansas.gov  Phone  501-335-7025

Statutory Authority for Promulgating Rules  Ark. Code Ann. Sec. 15-71-110(d) and Ark. Code Ann. Sec. 23-119-104

**Rule Title:**  General Rule K- Digital Asset Mining Business Requirements

| Intended Effective Date (Check One) | | Date |
|---|---|---|
| ☐ Emergency (ACA 25-15-204) | Legal Notice Published .......................... | 12/14,15,16/2024 |
| ☑ 10 Days After Filing (ACA 25-15-204) | Final Date for Public Comment ................. | 01/13/2025 |
| ☐ Other _____ (Must be more than 10 days after filing date.) | Reviewed by Legislative Council ............... | 02/13/2025 |
| | Adopted by State Agency ...................... | 01/28/2025 |

Electronic Copy of Rule e-mailed from:    (Required under ACA 25-15-218)

| Peter Alberg | Peter.Alberg@arkansas.gov | 02/13/2025 |
|---|---|---|
| **Contact Person** | **E-mail Address** | **Date** |

## CERTIFICATION OF AUTHORIZED OFFICER
I Hereby Certify That The Attached Rules Were Adopted
In Compliance with the Arkansas Administrative Act. (ACA 25-15-201 et. seq.)

_(signature)_
**Signature**

| 501-683-5814 | larry.bengal@aogc.state.ar.us |
|---|---|
| **Phone Number** | **E-mail Address** |

Director, Oil and Gas Commission
**Title**

2/11/2025
**Date**

**EXHIBIT 5**

**Rule K-1 Applicability, General Provisions and Definitions**
**REVISED MARK-UP DRAFT**

a) <u>Applicability</u>

   1) <u>This rule shall apply to any digital asset mining business, as defined by this rule.</u>

b) <u>General Provisions</u>

   1) <u>A digital asset mining business in operation before the effective date of this rule shall be in full compliance with the noise provisions enacted in Ark. Code Ann. § 14-1-604(b)(3) no later than ninety (90) days after this rule is effective.</u>

   2) <u>No digital asset mining business created after the effective date of this rule shall operate in Arkansas without first obtaining a permit in accordance with the provisions of this rule. An existing digital asset mining business shall not operate in Arkansas without first applying for a permit with the Oil and Gas Commission within ninety (90) days of the date this rule is promulgated. A digital asset mining business shall operate in accordance with Rules K-1, K-2, and K-3, and shall not operate if its digital asset mining permit application or transfer request is denied or its digital asset mining permit is revoked by the Commission.</u>

   3) <u>A digital asset mining business may operate in Arkansas if the digital asset mining business:</u>

      A) <u>Is issued a permit from the Commission in accordance with Rules K-2 or K-3;</u>

      B) <u>Establishes that the business is not a prohibited foreign-party-controlled business as defined by and in accordance with Ark. Code Ann. § 14-1-606;</u>

      C) <u>Maintains compliance with all local government ordinances;</u>

      D) <u>Maintains compliance with any rule or rate for utility service provided by or on behalf of a public entity;</u>

      E) <u>Maintains compliance with all applicable state and federal laws, including but not limited to, Ark. Code Ann. § 14-1-601 *et seq.* and § 23-119-101 *et seq.*;</u>

      F) <u>Pays all applicable taxes and government fees in acceptable forms of currency; and</u>

      G) <u>Operates in a manner that will not cause any stress on the electric public utility's generation capabilities or transmission network.</u>

c)   <u>Definitions</u>

1)   <u>"Applicant" means an entity who makes an application to the Oil and Gas Commission to operate a digital asset mining business.</u>

2)   <u>"Blockchain network" means a group of computers operating and processing together to execute a consensus mechanism to agree upon and verify data in a digital record for the purpose of generating digital assets.</u>

3)   <u>"Digital asset" means cryptocurrency, virtual currency, and natively electronic assets, including without limitation stable coins, nonfungible tokens, and other digital-only assets, that confer economic, proprietary, or access rights or powers.</u>

4)   <u>"Digital asset miner" is an individual who mines for digital assets and holds the digital asset mining business permit issued under this rule.</u>

5)   <u>"Digital asset mining" means use of electricity to power a computer for the purpose of securing or validating a blockchain network.</u>

6)   <u>"Digital asset mining business" means a group of computers working at a single site that consumes more than one megawatt (1 MW) of electrical energy on an average annual basis for the purpose of generating digital assets by securing a blockchain network.</u>

7)   <u>"Director" shall mean the Director of Production and Conservation of the Oil and Gas Commission.</u>

8)   <u>"Home digital asset mining" means mining digital assets in areas zoned for residential use.</u>

9)   <u>"Legislative body" means the quorum court of a county or the city council, board of directors, board of commissioners, or similar elected governing body of local government.</u>

10)  <u>"Local government" means a county, a city of the first class, a city of the second class, or an incorporated town.</u>

11)  <u>"Mining facility" means the building or other portable building structure where the digital asset mining computers are located.</u>

12)  <u>"Node" means a computational device that contains a copy of blockchain-distributed ledger technology and includes a series.</u>

13)  <u>"Ordinance" means an ordinance, resolution, or other appropriate legislative enactment of a legislative body.</u>

14) "Person" means an individual or legal entity.

15) "Regulated entity" means a:

    A) Digital asset miner;

    B) ~~any person associated with~~Person owning or operating a mining facility ~~a digital asset miner~~or a ~~mining facility~~digital asset mining business;

    C) Mining facility; or

    D) Digital asset mining business.

16) "Residence" means a permanent dwelling place, unit, or accessory structure.

## Rule K-2 Digital Asset Mining Business Permitting Requirements

a) No digital asset mining business created after the effective date of this rule shall operate in Arkansas without first obtaining a permit in accordance with the provisions of this rule.

b) An existing digital asset mining business shall not operate in Arkansas without first applying for a permit with the Oil and Gas Commission within ninety (90) days of the date this rule is promulgated.

c) A digital asset mining business shall operate in accordance with this rule and shall not operate if its digital asset mining permit application is denied, its digital asset mining permit is revoked by the Commission, or its digital asset mining permit is expired.

d) Any Digital Asset Mining Permit issued by the Commission shall not exceed a term of 5 years from the date of issuance.

e) The applicant shall file a completed initial permit application or renewal application, utilizing a form prescribed by the Director, which shall contain the following:

   1) A completed Organization Report on a form prescribed by the Director;

   2) Documentation establishing that the digital asset mining business is currently in good standing status with the Arkansas Secretary of State;

   3) A survey plat of the property boundaries on which the mining facility will be located that shows the location of the mining facility, and the location of all power and water lines and other utility services providing service to the mining facility;

   4) A current topographic map, aerial or satellite imagery, or other type of map that shows the location of the mining facility and the distance of all surrounding residences within a two (2) mile radius of the mining facility;

   5) A copy of an agreement with the entity supplying the electric power to the mining facility which certifies that the electric usage by the mining facility will not negatively impact the local electric grid or increase electric costs to the local customers;

   6) A copy of an agreement with the local water utility or private water well owner supplying water to the mining facility which certifies that the water usage by the mining facility will not negatively impact the local water supply and water rates of the local customers;

7)  A notarized affidavit certifying that the digital asset mining business operating the mining facility is not a prohibited foreign-party-controlled business and is in compliance with Ark. Code Ann. § 14-1-606; and

8)  A technical description, including schematics and engineering specifications of the system proposed to be utilized or the local government location approvals necessary to comply with noise-reduction techniques in accordance with Ark. Code Ann. § 14-1-604(b)(3), including without limitation schematics or specifications that demonstrate:

A)  The digital asset mining business will use a liquid cooling or submerged cooling process for the mining facility;

B)  The mining facility shall be fully enclosed around all sides, including above and below the equipment producing the noise, with material that is reasonably calculated by industry standards to reduce noise emissions to a level that is acceptable to a reasonable person under similar circumstances; or

C)  Upon approval by the local government, the mining facility may use a passively cooled pre-manufactured container without additionally enclosing the container in a complete envelope if the mining facility is located or relates to an area:

i)  That is at least two thousand (2,000) feet away from the nearest residential or commercial use structure; or

ii)  That is zoned for industrial use or an otherwise approved use.

f)  Additionally, the digital asset mining business shall:

1)  Publish general public notice of the application no more than ten (10) ~~at least forty-five (45)~~ days prior to filing the application with the Commission in a newspaper having a general circulation in the county, or in each county, if there shall be more than one, within a one (1) mile radius from the proposed mining facility is located. In addition, the public notice should be large font and surrounded by a printed border to highlight the published notice; and

2)  Provide notice by mailing, ~~at least forty-five (45)~~ no more than ten (10) days prior to filing the application with the Commission, via certified mail, FedEx, UPS, or other method that provides proof of mailing and delivery to the following persons and entities:

A)  Any local government having jurisdiction over the area where the mining facility is proposed to be located;

B)  The Division of Environmental Quality;

C)    All surface owners of record within one (1) mile of the mining facility; and

D)    Any other persons as determined by the Director of the Commission.

3)    The notice given by the digital asset mining business shall contain the following:

A)    The name and address of the applicant.

B)    A brief description of the nature and purpose of the application.

C)    A description of the land on which the mining facility will be constructed.

D)    A statement which explains that a copy of the application and exhibits may be obtained from the Commission or the digital asset mining business. When the Commission receives a request for a copy of the application from an interested party, the Commission may direct the digital asset mining business to deliver the application to the interested party. The cost of such notice and mailing of the application shall be paid for by the digital asset mining business.

E)    A statement which explains that all comments or objections regarding the application must be in writing and submitted to the Commission prior to the expiration of the forty-five (45) day notice period specified in subparagraph ~~f) 1) above~~ g) 1) below.

g)    Objections

1)    Objections to the application must be received by the Director within forty-five (45) days after the publication date of the notice specified in subparagraph f) 1) above or the postmark date of the notice specified in subparagraph f) 2) above, whichever date is later. If an objection is received, the application shall be referred to the Commission for determination without imposition of a filing fee, and a hearing shall be conducted in accordance with General Rules A-2 and A-3 and all other applicable hearing procedures.

2)    If a timely objection is not received by the Director and the application is deemed administratively complete, the permit shall be issued unless the Director deems it necessary to refer the application to the Commission for determination for the purpose of protecting public health and safety, protecting the environment, or preventing damage to property. No filing fee shall be assessed by the Commission for any hearing set pursuant to this referral by the Director.

h)    If the applicant satisfies the requirements of all applicable statutes and this rule, a permit shall be issued, unless:

1)  The applicant has falsified or otherwise misstated any material information on or relative to the permit application;

2)  The applicant is or was an owner, officer, director, partner, member, or manager of digital asset mining business, or other person with an interest in the entity exceeding five-percent (5%), that has failed to abate any outstanding violations of statutes or rules, or comply with orders of the Commission as specified in a final administrative decision of the Commission in accordance with the provisions of this rule;

3)  The applicant is a current permit holder that has failed to abate outstanding violations of any statutes or rules, or comply with orders of the Commission as specified in a final administrative decision of the Commission in accordance with the provisions of this rule; or

4)  If the Director determines that the applicant or permit holder, or an owner, officer, director, partner, member, or manager or other person with an interest exceeding five-percent (5%) in the digital asset mining business, has a history of violating any applicable statutes, Commission rules, permit condition or order of the Commission, the Arkansas Pollution Control and Ecology Commission, or any other state or federal regulatory agency, the permit shall be denied.

i)  If a permit is denied pursuant to subparagraph h) above, the applicant may request a hearing with the Commission on this determination, in accordance with General Rules A-2, A-3, and other applicable hearing procedures.

j)  Digital Asset Mining Permit Revocation Procedures

1)  The Director may revoke a digital asset mining permit if:

   A)  The permit holder fails to meet permit conditions as specified in the digital asset mining permit;

   B)  The digital asset mining permit was issued in error;

   C)  The permit holder fails to meet any applicable statute or law; or

   D)  The permit holder falsified or otherwise misstated any material information in the application form.

2)  The Director shall notify the permit holder in writing of the revocation of the digital asset mining permit. Following the notice of revocation, the permit holder shall have thirty (30) days from the date of the digital asset mining permit revocation notice to appeal the Director's decision to revoke the digital asset mining permit. If the permit revocation is appealed, a hearing contesting the permit revocation shall be conducted in accordance with General Rules A-2, A-3, and other applicable

hearing procedures. Operation of the mining facility may not commence or continue during the appeal process. A revocation of a digital asset mining permit for which an appeal has not been timely filed shall become a final administrative decision of the Commission.

## Rule K-3 Digital Asset Mining Business Permit Transfer Procedures

a)  Definitions

1)  "Current permit holder" means the person required to hold the permit or to whom the permit was issued and who is the owner of the digital asset mining business and possesses the full rights and responsibilities for operating the business in accordance with applicable Arkansas law, rule, or order of the Commission.

2)  "New permit holder" means the person acquiring the digital asset mining business and who obtains the full rights and responsibilities for operating the business and possessing the permit in accordance with applicable Arkansas law, rule, or order of the Commission.

3)  "Transfer" means any voluntary or involuntary assignment, devise, release, transfer, takeover, buyout, merger, sale, conveyance, or other transfer of any kind.

b)  The provisions of this rule apply to all transfers of the interest of the permit holder, including but not limited to:

1)  A change of ownership of the right to operate the digital asset mining business;

2)  A change of ownership or membership in the corporate entity that operates the digital asset mining business or a change in the designation of the owner or operator under an operating agreement or other similar agreement;

3)  An action of the owners of separate interests who designate a new owner to be permit holder; or

4)  A change required by the appointment, by a court of competent jurisdiction, of a trustee or a receiver to exercise custody and control over the digital asset mining business.

c)  Notification of a transfer shall be given to the Director, or his or her designee, by the current permit holder on a form prescribed by the Director.

d)  The notification shall be signed by the current permit holder and the new permit holder, or by authorized representatives specified on the Commission Organization Report filed in accordance with Rule K-2 e) 1).

e)  Prior to the Director, or his or her designee, approving the transfer request, the new permit holder must:

1)  Be authorized to do business within the State of Arkansas; and

2)  Comply with all applicable provisions of state law and Rule K-2.

f)    A transfer to a new permit holder shall be denied by the Director, or his or her designee, if:

    1)    The new permit holder has not fully satisfied all applicable statutory and rule requirements;

    2)    The Commission has not approved the transfer in accordance with paragraph e) above;

    3)    The new permit holder has falsified or otherwise misstated any material information on or relative to the transfer application; or

    4)    No further permits or authorities may be issued in accordance with paragraph e) above.

g)    The new permit holder shall assume compliance with all existing permit obligations and be responsible with complying with all regulatory requirements associated with the permit.

h)    If the digital asset mining business or mining facility is in violation of any rules, statutes, or orders of the Commission at the time of the transfer request to the new permit holder, the transfer request shall be denied pending abatement of all violations by the current permit holder. However, if the new permit holder, after being notified of the violation(s), agrees in writing to the transfer approval including conditions to abate all violations, the transfer may be approved by the Director, or his or her designee, in accordance with this rule. Failure to abate the violations within the time-period specified by the Director, or his or her designee, may result in revocation of the transfer approval and other applicable enforcement actions in accordance with General Rule A-5.

i)    The current permit holder is not responsible for any regulatory violation caused by the actions of the new permit holder during the permit transfer process. However, if the transfer is denied by the Director, or his or her designee, the current permit holder will assume all responsibility for any violations caused by the new permit holder. Nothing in this subparagraph shall affect the contractual rights and obligations between the person or entity transferring the permit and the person or entity acquiring the permit.

j)    The transfer request shall not affect the rights of the Commission, or any obligation or duty of the current permit holder arising under any applicable Arkansas law, rule, or order of the Commission.

k)    The Director shall notify the current and new permit holder of the transfer approval or denial in writing. Following the approval or denial of the transfer approval request, the current or new permit holder shall have thirty (30) days from the date of the approval or denial to appeal the Director's decision in accordance with General Rules A-2, A-3, and other applicable hearing procedures. A transfer request approval or denial, for which a

timely appeal has not been filed, shall become a final administrative decision of the Commission.

l)   Permit Transfer Revocation Procedures

    1)   The Director may revoke a digital asset mining business permit transfer approval if the permit holder fails to comply with conditions as specified in the permit transfer approval, the permit transfer approval was issued in error, or the permit holder falsified or otherwise misstated any material information in the application form.

    2)   The Director shall notify the permit holder of the digital asset mining business permit transfer revocation in writing. Following the revocation notice, the permit holder is required to cease operation of the mining facility. The permit holder shall have thirty (30) days from the date of the permit transfer revocation to appeal the Director's decision to revoke the transfer approval in accordance with General Rules A-2, A-3, and other applicable hearing procedures. Operation of the mining facility may not commence or continue during the appeal process. A revocation of a permit transfer approval for which an appeal has not been timely filed shall become a final administrative decision of the Commission.

## Rule K-4 Digital Asset Mining Business Enforcement Procedures

a) Any regulated entity operating a digital asset mining business is subject to the enforcement provisions of this rule and the Arkansas Data Centers Act of 2023, Ark. Code Ann. § 14-1-601 *et seq.* and the digital asset mining provisions of Ark. Code Ann. § 23-119-101 *et seq.*

b) Notice of Non-Compliance

   1) A Notice of Non-Compliance may be issued when any regulated entity is not in compliance with any requirement of this rule, Ark. Code Ann. § 14-1-601 *et seq.*, or § 23-119-101 *et seq.*, and:

      A) The non-compliance was not caused by the regulated entity's deliberate action;

      B) Any action necessary to abate the non-compliance was commenced immediately, and was or will be completed within a specified date, as established by the Director, or his or her designee, not to exceed thirty (30) days from the date that the regulated entity was determined to be out of compliance; and

      C) The non-compliance has not caused and cannot reasonably be expected to cause significant harm to public health and safety or damage to property.

   2) The Notice of Non-Compliance shall be documented in writing and delivered via first class mail to the regulated entity or to the regulated entity's representative as reported on the Commission Organization Report. The written notification shall indicate the nature and circumstances of the non-compliance, and the time within which and the means by which the non-compliance is to be abated.

   2) If abatement is not completed as specified in the written notification, the Director, or his or her designee, may issue a formal Notice of Violation in accordance with subparagraph (c) below.

   4) The provisions of this subparagraph shall not apply to the following types of incidents, which may require a Notice of Violation to be issued in accordance with subparagraph (c) below:

      A) Conducting any regulated activity prior to issuance of the appropriate Commission permit;

      B) Failure to bring an existing mining facility into compliance with Arkansas law or Rule K-2.

c)    Notice of Violation(s)

    1)    A Notice of Violation may be issued by the Director, or his or her designee, when any regulated entity is in violation of any requirements of Ark. Code Ann. § 14-1-601 *et seq.*, § 23-119-101 *et seq.*, or rules, orders, or any permit conditions of the Commission. Unless otherwise determined by the Commission after notice and a hearing, a regulated entity shall not be compelled by the Commission to abate violations of the Arkansas law or rules, orders, or any permit conditions of the Commission in the absence of the issuance of an underlying Notice of Violation.

    2)    The Notice of Violation shall be in writing and contain:

        A)    A statement regarding the nature of the violation, including a citation to the specific section of Ark. Code Ann. § 14-1-601 *et seq.*, or § 23-119-101 *et seq.* or rules, orders, or any permit conditions of the Commission alleged to have been violated;

        B)    The suggested action needed to abate the violation, including any appropriate remedial measures to prevent future violations;

        C)    The time within which the violation shall be abated; and

        D)    A notice of any civil penalties, as specified in subparagraph e) below, that the Director will request the Commission issue.

    3)    The Notice of Violation may include a cessation requirement, or a separate cessation order may be issued for the following types of violations:

        A)    Operating a digital asset mining business or mining facility without a Commission permit;

        B)    Improper disposal or discharge of cooling fluids;

        C)    Failure to comply with the violation abatement timeframe established in a Notice of Violation.

    4)    The Director, or his or her designee, shall send, via certified mail, the Notice of Violation to the regulated entity charged with the violation(s), or the regulated entity's representative as reported on the Commission Organization Report, or provide personal delivery of a copy of the notice to the regulated entity, or the regulated entity's representative.

    5)    The regulated entity charged with the violation(s) may request a Director's review of the Notice of Violation and provide the Director, in writing, any information in

mitigation of the violation(s) within thirty (30) calendar days of the mailing or personal delivery of the original Notice of Violation, unless a shorter time period is specified in the Notice of Violation for instances where there is a condition that creates an imminent danger to the health or safety of the public or threatens significant environmental harm or damage to property. Such written information may include a proposed alternative to the required action needed to abate the violation(s). Upon timely receipt of such documentation from the regulated entity, the Director shall conduct a review.

6) During the review, the Director may consider any of the following criteria in reaching a final Director's decision regarding the violation(s):

A) The regulated entity's history of previous violations, including violations at other locations and under other permits;

B) The seriousness of the violation, including any irreparable harm to public health and safety, the environment, or damage to property;

C) The degree of culpability of the regulated entity; and

D) The existence of any additional conditions or factors in aggravation or mitigation of the violation, including information provided by the regulated entity.

7) Upon completion of the review, the Director shall issue a final Director's decision to:

A) Affirm the violation;

B) Vacate the violation;

C) Amend or modify the type of violation and abatement requirements specified in the violation;

D) Establish probationary or permanent modification or conditions to any underlying permit related to the violation, which may include special monitoring or reporting requirements; or

E) Enter into a settlement agreement to extend the amount of time provided to complete remedial actions necessary to abate the violations or reduce the amount of the requested assessed civil penalty.

8) The final Director's decision shall be delivered to the regulated entity, or the Regulated entity's representative, as reported on Commission Organization Report, via first class mail. The final Director's decision may be appealed to the Commission by filing an application in accordance with General Rule A-2, A-3,

and other applicable hearing procedures. The Director must receive the application to appeal the final Director's decision within thirty (30) days of the mailing of the final Director's decision. The application shall state the reason for the appeal and the application shall be scheduled to be heard by the Commission in accordance with General Rule A-2, A-3, and other applicable hearing procedures.

9)  A Notice of Violation for which a Director's review has not been requested shall become a final administrative decision of the Commission thirty (30) days following the mailing of the Notice of Violation.

10) A final Director's decision not appealed to the Commission within thirty (30) days of the mailing of the final Director's decision shall become a final administrative decision of the Commission.

11) All violations specified in a Notice of Violation which have become a final administrative decision in accordance with subparagraph c) 9), included in a final Director's decision which has become a final administrative decision of the Commission in accordance with subparagraph e) 10), or included in an order of the Commission, shall be fully abated within the time frame specified in the original Notice of Violation, final Director's decision, or order of the Commission. No further permits or authorization shall be issued to the regulated entity until all outstanding violations specified in a Notice of Violation which has become a final administrative decision in accordance with subparagraph c) 9), a final Director's decision which has become a final administrative decision of the Commission in accordance with subparagraph c) 10), or by order of the Commission have been fully abated.

d) In addition to the issuance of a Notice of Violation, the Director and the Commission may initiate investigative or enforcement proceedings upon receipt of a complaint by:

1)  Initiating a referral to the Attorney General for enforcement in accordance with Ark. Code Ann. § 14-1-606;

2)  Making reasonable investigations and inspections;

3)  Examining properties, leases, papers, books, and records;

4)  Holding hearings;

5)  Requiring the keeping of records and the making of reports;

6)  Taking such action as may be reasonably necessary to enforce state law and Commission rules, including compliance with Ark. Code Ann. §§ 14-1-601 *et seq.* and 23-119-101 *et seq.*

e)     Civil Penalties

1)    The Director shall determine whether to request the assessment of civil penalties based on failure to comply with the applicable abatement requirements for violations issued under subparagraphs (e) (2), (3), and (4) below. If a civil penalty is requested by the Director, the regulated entity may voluntarily agree to the assessment and pay the civil penalty as requested or modified by the Director, or the Director or his designee may file an application, in accordance with General Rule A-2, A-3, and other applicable hearing procedures, to request the issuance of the requested civil penalty by the Commission. The maximum amount of the Director's requested civil penalty shall be computed as provided in subparagraphs (e) (2), (3), and (4) below. However, the Commission is not bound by the Director's request, or the amounts provided below, and may impose civil penalties of up to five thousand dollars ($5,000.00) per day per violation as permitted by statute.

2)    Administrative violations are defined as failure to file required reports and forms and to provide required notices. The Director may request the assessment of up to two thousand five hundred ($2,500.00) dollars per administrative violation, plus up to five hundred dollars ($500.00) per day for each day the violation remains unabated after the specified compliance date. The per-administrative-violation civil penalty request shall be calculated as follows:

A)    No previous violation of the same rule: one thousand dollars ($1,000.00). One previous violation of the same rule: one thousand five hundred dollars ($1,500.00). Two or more previous violations of the same rule: two thousand five hundred dollars ($2,500.00).

B)    The time frame used for determining previous violations shall be limited to the regulated entity's violation record for the preceding five (5) full calendar years before the issuance of the violation.

3)    Operating violations are defined as failure to maintain compliance with Commission digital asset mining rules. These violations include, but are not limited to, regulated activities such as operating a mining facility without the proper permit or transfer of ownership and failure to maintain a mining facility in compliance with these rules. The Director may request the assessment of up to five thousand dollars ($5,000.00) per operating violation plus up to two thousand five hundred dollars ($2,500.00) per day for each day the violation remains unabated after the specified compliance date, with the exception that operating violations as specified in statute are limited to a maximum of five thousand dollars ($5,000.00) per day per operating violation. The per-operating-violation civil penalty shall be calculated as follows:

A) No previous violation of the same rule: two thousand five hundred dollars ($2,500.00). One previous violation of the same rule: five thousand dollars ($5,000.00).

B) The time frame used for determining previous violations shall be limited to the regulated entity's violation record for the preceding five (5) full calendar years before the issuance of the violation.

f) All civil penalties assessed and paid to the Commission in accordance with this subpart shall be deposited in the Commission operating fund.

**Rule K-1 Applicability, General Provisions and Definitions**
**REVISED CLEAN DRAFT**

a)    Applicability

    1)    This rule shall apply to any digital asset mining business, as defined by this rule.

b)    General Provisions

    1)    A digital asset mining business in operation before the effective date of this rule shall be in full compliance with the noise provisions enacted in Ark. Code Ann. § 14-1-604(b)(3) no later than ninety (90) days after this rule is effective.

    2)    No digital asset mining business created after the effective date of this rule shall operate in Arkansas without first obtaining a permit in accordance with the provisions of this rule. An existing digital asset mining business shall not operate in Arkansas without first applying for a permit with the Oil and Gas Commission within ninety (90) days of the date this rule is promulgated. A digital asset mining business shall operate in accordance with Rules K-1, K-2, and K-3, and shall not operate if its digital asset mining permit application or transfer request is denied or its digital asset mining permit is revoked by the Commission.

    3)    A digital asset mining business may operate in Arkansas if the digital asset mining business:

        A)    Is issued a permit from the Commission in accordance with Rules K-2 or K-3;

        B)    Establishes that the business is not a prohibited foreign-party-controlled business as defined by and in accordance with Ark. Code Ann. § 14-1-606;

        C)    Maintains compliance with all local government ordinances;

        D)    Maintains compliance with any rule or rate for utility service provided by or on behalf of a public entity;

        E)    Maintains compliance with all applicable state and federal laws, including but not limited to, Ark. Code Ann. § 14-1-601 *et seq.* and § 23-119-101 *et seq.*;

        F)    Pays all applicable taxes and government fees in acceptable forms of currency; and

        G)    Operates in a manner that will not cause any stress on the electric public utility's generation capabilities or transmission network.

c)  Definitions

   1)  "Applicant" means an entity who makes an application to the Oil and Gas Commission to operate a digital asset mining business.

   2)  "Blockchain network" means a group of computers operating and processing together to execute a consensus mechanism to agree upon and verify data in a digital record for the purpose of generating digital assets.

   3)  "Digital asset" means cryptocurrency, virtual currency, and natively electronic assets, including without limitation stable coins, nonfungible tokens, and other digital-only assets, that confer economic, proprietary, or access rights or powers.

   4)  "Digital asset miner" is an individual who mines for digital assets and holds the digital asset mining business permit issued under this rule.

   5)  "Digital asset mining" means use of electricity to power a computer for the purpose of securing or validating a blockchain network.

   6)  "Digital asset mining business" means a group of computers working at a single site that consumes more than one megawatt (1 MW) of electrical energy on an average annual basis for the purpose of generating digital assets by securing a blockchain network.

   7)  "Director" shall mean the Director of Production and Conservation of the Oil and Gas Commission.

   8)  "Home digital asset mining" means mining digital assets in areas zoned for residential use.

   9)  "Legislative body" means the quorum court of a county or the city council, board of directors, board of commissioners, or similar elected governing body of local government.

   10)  "Local government" means a county, a city of the first class, a city of the second class, or an incorporated town.

   11)  "Mining facility" means the building or other portable building structure where the digital asset mining computers are located.

   12)  "Node" means a computational device that contains a copy of blockchain-distributed ledger technology and includes a series.

   13)  "Ordinance" means an ordinance, resolution, or other appropriate legislative enactment of a legislative body.

14) "Person" means an individual or legal entity.

15) "Regulated entity" means a:

    A)    Digital asset miner;

    B)    Person owning or operating a mining facility or a digital asset mining business;

    C)    Mining facility; or

    D)    Digital asset mining business.

16) "Residence" means a permanent dwelling place, unit, or accessory structure.

**Rule K-2 Digital Asset Mining Business Permitting Requirements**

a) No digital asset mining business created after the effective date of this rule shall operate in Arkansas without first obtaining a permit in accordance with the provisions of this rule.

b) An existing digital asset mining business shall not operate in Arkansas without first applying for a permit with the Oil and Gas Commission within ninety (90) days of the date this rule is promulgated.

c) A digital asset mining business shall operate in accordance with this rule and shall not operate if its digital asset mining permit application is denied, its digital asset mining permit is revoked by the Commission, or its digital asset mining permit is expired.

d) Any Digital Asset Mining Permit issued by the Commission shall not exceed a term of 5 years from the date of issuance.

e) The applicant shall file a completed initial permit application or renewal application, utilizing a form prescribed by the Director, which shall contain the following:

   1) A completed Organization Report on a form prescribed by the Director;

   2) Documentation establishing that the digital asset mining business is currently in good standing status with the Arkansas Secretary of State;

   3) A survey plat of the property boundaries on which the mining facility will be located that shows the location of the mining facility, and the location of all power and water lines and other utility services providing service to the mining facility;

   4) A current topographic map, aerial or satellite imagery, or other type of map that shows the location of the mining facility and the distance of all surrounding residences within a two (2) mile radius of the mining facility;

   5) A copy of an agreement with the entity supplying the electric power to the mining facility which certifies that the electric usage by the mining facility will not negatively impact the local electric grid or increase electric costs to the local customers;

   6) A copy of an agreement with the local water utility or private water well owner supplying water to the mining facility which certifies that the water usage by the mining facility will not negatively impact the local water supply and water rates of the local customers;

7)    A notarized affidavit certifying that the digital asset mining business operating the mining facility is not a prohibited foreign-party-controlled business and is in compliance with Ark. Code Ann. § 14-1-606; and

8)    A technical description, including schematics and engineering specifications of the system proposed to be utilized or the local government location approvals necessary to comply with noise-reduction techniques in accordance with Ark. Code Ann. § 14-1-604(b)(3), including without limitation schematics or specifications that demonstrate:

    A)    The digital asset mining business will use a liquid cooling or submerged cooling process for the mining facility;

    B)    The mining facility shall be fully enclosed around all sides, including above and below the equipment producing the noise, with material that is reasonably calculated by industry standards to reduce noise emissions to a level that is acceptable to a reasonable person under similar circumstances; or

    C)    Upon approval by the local government, the mining facility may use a passively cooled pre-manufactured container without additionally enclosing the container in a complete envelope if the mining facility is located or relates to an area:

        i)    That is at least two thousand (2,000) feet away from the nearest residential or commercial use structure; or

        ii)    That is zoned for industrial use or an otherwise approved use.

f)    Additionally, the digital asset mining business shall:

1)    Publish general public notice of the application no more than ten (10) days prior to filing the application with the Commission in a newspaper having a general circulation in the county, or in each county, if there shall be more than one, within a one (1) mile radius from the proposed mining facility is located. In addition, the public notice should be large font and surrounded by a printed border to highlight the published notice; and

2)    Provide notice by mailing, no more than ten (10) days prior to filing the application with the Commission, via certified mail, FedEx, UPS, or other method that provides proof of mailing and delivery to the following persons and entities:

    A)    Any local government having jurisdiction over the area where the mining facility is proposed to be located;

    B)    The Division of Environmental Quality;

    C)    All surface owners of record within one (1) mile of the mining facility; and

    D)    Any other persons as determined by the Director of the Commission.

3)    The notice given by the digital asset mining business shall contain the following:

    A)    The name and address of the applicant.

    B)    A brief description of the nature and purpose of the application.

    C)    A description of the land on which the mining facility will be constructed.

    D)    A statement which explains that a copy of the application and exhibits may be obtained from the Commission or the digital asset mining business. When the Commission receives a request for a copy of the application from an interested party, the Commission may direct the digital asset mining business to deliver the application to the interested party. The cost of such notice and mailing of the application shall be paid for by the digital asset mining business.

    E)    A statement which explains that all comments or objections regarding the application must be in writing and submitted to the Commission prior to the expiration of the forty-five (45) day notice period specified in subparagraph g) 1) below.

g)    Objections

1)    Objections to the application must be received by the Director within forty-five (45) days after the publication date of the notice specified in subparagraph f) 1) above or the postmark date of the notice specified in subparagraph f) 2) above, whichever date is later. If an objection is received, the application shall be referred to the Commission for determination without imposition of a filing fee, and a hearing shall be conducted in accordance with General Rules A-2 and A-3 and all other applicable hearing procedures.

2)    If a timely objection is not received by the Director and the application is deemed administratively complete, the permit shall be issued unless the Director deems it necessary to refer the application to the Commission for determination for the purpose of protecting public health and safety, protecting the environment, or preventing damage to property. No filing fee shall be assessed by the Commission for any hearing set pursuant to this referral by the Director.

h)    If the applicant satisfies the requirements of all applicable statutes and this rule, a permit shall be issued, unless:

1)    The applicant has falsified or otherwise misstated any material information on or relative to the permit application;

2)    The applicant is or was an owner, officer, director, partner, member, or manager of digital asset mining business, or other person with an interest in the entity exceeding five-percent (5%), that has failed to abate any outstanding violations of statutes or rules, or comply with orders of the Commission as specified in a final administrative decision of the Commission in accordance with the provisions of this rule;

3)    The applicant is a current permit holder that has failed to abate outstanding violations of any statutes or rules, or comply with orders of the Commission as specified in a final administrative decision of the Commission in accordance with the provisions of this rule; or

4)    If the Director determines that the applicant or permit holder, or an owner, officer, director, partner, member, or manager or other person with an interest exceeding five-percent (5%) in the digital asset mining business, has a history of violating any applicable statutes, Commission rules, permit condition or order of the Commission, the Arkansas Pollution Control and Ecology Commission, or any other state or federal regulatory agency, the permit shall be denied.

i)  If a permit is denied pursuant to subparagraph h) above, the applicant may request a hearing with the Commission on this determination, in accordance with General Rules A-2, A-3, and other applicable hearing procedures.

j)  Digital Asset Mining Permit Revocation Procedures

1)    The Director may revoke a digital asset mining permit if:

A)    The permit holder fails to meet permit conditions as specified in the digital asset mining permit;

B)    The digital asset mining permit was issued in error;

C)    The permit holder fails to meet any applicable statute or law; or

D)    The permit holder falsified or otherwise misstated any material information in the application form.

2)    The Director shall notify the permit holder in writing of the revocation of the digital asset mining permit. Following the notice of revocation, the permit holder shall have thirty (30) days from the date of the digital asset mining permit revocation notice to appeal the Director's decision to revoke the digital asset mining permit. If the permit revocation is appealed, a hearing contesting the permit revocation shall be conducted in accordance with General Rules A-2, A-3, and other applicable

hearing procedures. Operation of the mining facility may not commence or continue during the appeal process. A revocation of a digital asset mining permit for which an appeal has not been timely filed shall become a final administrative decision of the Commission.

**Rule K-3 Digital Asset Mining Business Permit Transfer Procedures**

a)  Definitions

   1)  "Current permit holder" means the person required to hold the permit or to whom the permit was issued and who is the owner of the digital asset mining business and possesses the full rights and responsibilities for operating the business in accordance with applicable Arkansas law, rule, or order of the Commission.

   2)  "New permit holder" means the person acquiring the digital asset mining business and who obtains the full rights and responsibilities for operating the business and possessing the permit in accordance with applicable Arkansas law, rule, or order of the Commission.

   3)  "Transfer" means any voluntary or involuntary assignment, devise, release, transfer, takeover, buyout, merger, sale, conveyance, or other transfer of any kind.

b)  The provisions of this rule apply to all transfers of the interest of the permit holder, including but not limited to:

   1)  A change of ownership of the right to operate the digital asset mining business;

   2)  A change of ownership or membership in the corporate entity that operates the digital asset mining business or a change in the designation of the owner or operator under an operating agreement or other similar agreement;

   3)  An action of the owners of separate interests who designate a new owner to be permit holder; or

   4)  A change required by the appointment, by a court of competent jurisdiction, of a trustee or a receiver to exercise custody and control over the digital asset mining business.

c)  Notification of a transfer shall be given to the Director, or his or her designee, by the current permit holder on a form prescribed by the Director.

d)  The notification shall be signed by the current permit holder and the new permit holder, or by authorized representatives specified on the Commission Organization Report filed in accordance with Rule K-2 e) 1).

e)  Prior to the Director, or his or her designee, approving the transfer request, the new permit holder must:

   1)  Be authorized to do business within the State of Arkansas; and

   2)  Comply with all applicable provisions of state law and Rule K-2.

f) A transfer to a new permit holder shall be denied by the Director, or his or her designee, if:

    1) The new permit holder has not fully satisfied all applicable statutory and rule requirements;

    2) The Commission has not approved the transfer in accordance with paragraph e) above;

    3) The new permit holder has falsified or otherwise misstated any material information on or relative to the transfer application; or

    4) No further permits or authorities may be issued in accordance with paragraph e) above.

g) The new permit holder shall assume compliance with all existing permit obligations and be responsible with complying with all regulatory requirements associated with the permit.

h) If the digital asset mining business or mining facility is in violation of any rules, statutes, or orders of the Commission at the time of the transfer request to the new permit holder, the transfer request shall be denied pending abatement of all violations by the current permit holder. However, if the new permit holder, after being notified of the violation(s), agrees in writing to the transfer approval including conditions to abate all violations, the transfer may be approved by the Director, or his or her designee, in accordance with this rule. Failure to abate the violations within the time-period specified by the Director, or his or her designee, may result in revocation of the transfer approval and other applicable enforcement actions in accordance with General Rule A-5.

i) The current permit holder is not responsible for any regulatory violation caused by the actions of the new permit holder during the permit transfer process. However, if the transfer is denied by the Director, or his or her designee, the current permit holder will assume all responsibility for any violations caused by the new permit holder. Nothing in this subparagraph shall affect the contractual rights and obligations between the person or entity transferring the permit and the person or entity acquiring the permit.

j) The transfer request shall not affect the rights of the Commission, or any obligation or duty of the current permit holder arising under any applicable Arkansas law, rule, or order of the Commission.

k) The Director shall notify the current and new permit holder of the transfer approval or denial in writing. Following the approval or denial of the transfer approval request, the current or new permit holder shall have thirty (30) days from the date of the approval or denial to appeal the Director's decision in accordance with General Rules A-2, A-3, and other applicable hearing procedures. A transfer request approval or denial, for which a

timely appeal has not been filed, shall become a final administrative decision of the Commission.

l)    Permit Transfer Revocation Procedures

    1)    The Director may revoke a digital asset mining business permit transfer approval if the permit holder fails to comply with conditions as specified in the permit transfer approval, the permit transfer approval was issued in error, or the permit holder falsified or otherwise misstated any material information in the application form.

    2)    The Director shall notify the permit holder of the digital asset mining business permit transfer revocation in writing. Following the revocation notice, the permit holder is required to cease operation of the mining facility. The permit holder shall have thirty (30) days from the date of the permit transfer revocation to appeal the Director's decision to revoke the transfer approval in accordance with General Rules A-2, A-3, and other applicable hearing procedures. Operation of the mining facility may not commence or continue during the appeal process. A revocation of a permit transfer approval for which an appeal has not been timely filed shall become a final administrative decision of the Commission.

## Rule K-4 Digital Asset Mining Business Enforcement Procedures

a)   Any regulated entity operating a digital asset mining business is subject to the
     enforcement provisions of this rule and the Arkansas Data Centers Act of 2023, Ark.
     Code Ann. § 14-1-601 *et seq.* and the digital asset mining provisions of Ark. Ann.
     § 23-119-101 *et seq.*

b)   Notice of Non-Compliance

   1)   A Notice of Non-Compliance may be issued when any regulated entity is not in
        compliance with any requirement of this rule, Ark. Code Ann. § 14-1-601 *et seq.*,
        or § 23-119-101 *et seq.*, and:

        A)   The non-compliance was not caused by the regulated entity's deliberate
             action;

        B)   Any action necessary to abate the non-compliance was commenced
             immediately, and was or will be completed within a specified date, as
             established by the Director, or his or her designee, not to exceed thirty (30)
             days from the date that the regulated entity was determined to be out of
             compliance; and

        C)   The non-compliance has not caused and cannot reasonably be expected to
             cause significant harm to public health and safety or damage to property.

   2)   The Notice of Non-Compliance shall be documented in writing and delivered via
        first class mail to the regulated entity or to the regulated entity's representative as
        reported on the Commission Organization Report. The written notification shall
        indicate the nature and circumstances of the non-compliance, and the time within
        which and the means by which the non-compliance is to be abated.

   2)   If abatement is not completed as specified in the written notification, the Director,
        or his or her designee, may issue a formal Notice of Violation in accordance with
        subparagraph (c) below.

   4)   The provisions of this subparagraph shall not apply to the following types of
        incidents, which may require a Notice of Violation to be issued in accordance with
        subparagraph (c) below:

        A)   Conducting any regulated activity prior to issuance of the appropriate
             Commission permit;

        B)   Failure to bring an existing mining facility into compliance with Arkansas
             law or Rule K-2.

c)    Notice of Violation(s)

    1)    A Notice of Violation may be issued by the Director, or his or her designee, when any regulated entity is in violation of any requirements of Ark. Code Ann. § 14-1-601 *et seq.*, § 23-119-101 *et seq.*, or rules, orders, or any permit conditions of the Commission. Unless otherwise determined by the Commission after notice and a hearing, a regulated entity shall not be compelled by the Commission to abate violations of the Arkansas law or rules, orders, or any permit conditions of the Commission in the absence of the issuance of an underlying Notice of Violation.

    2)    The Notice of Violation shall be in writing and contain:

        A)    A statement regarding the nature of the violation, including a citation to the specific section of Ark. Code Ann. § 14-1-601 *et seq.*, or § 23-119-101 *et seq.* or rules, orders, or any permit conditions of the Commission alleged to have been violated;

        B)    The suggested action needed to abate the violation, including any appropriate remedial measures to prevent future violations;

        C)    The time within which the violation shall be abated; and

        D)    A notice of any civil penalties, as specified in subparagraph e) below, that the Director will request the Commission issue.

    3)    The Notice of Violation may include a cessation requirement, or a separate cessation order may be issued for the following types of violations:

        A)    Operating a digital asset mining business or mining facility without a Commission permit;

        B)    Improper disposal or discharge of cooling fluids;

        C)    Failure to comply with the violation abatement timeframe established in a Notice of Violation.

    4)    The Director, or his or her designee, shall send, via certified mail, the Notice of Violation to the regulated entity charged with the violation(s), or the regulated entity's representative as reported on the Commission Organization Report, or provide personal delivery of a copy of the notice to the regulated entity, or the regulated entity's representative.

    5)    The regulated entity charged with the violation(s) may request a Director's review of the Notice of Violation and provide the Director, in writing, any information in

mitigation of the violation(s) within thirty (30) calendar days of the mailing or personal delivery of the original Notice of Violation, unless a shorter time period is specified in the Notice of Violation for instances where there is a condition that creates an imminent danger to the health or safety of the public or threatens significant environmental harm or damage to property. Such written information may include a proposed alternative to the required action needed to abate the violation(s). Upon timely receipt of such documentation from the regulated entity, the Director shall conduct a review.

6) During the review, the Director may consider any of the following criteria in reaching a final Director's decision regarding the violation(s):

    A) The regulated entity's history of previous violations, including violations at other locations and under other permits;

    B) The seriousness of the violation, including any irreparable harm to public health and safety, the environment, or damage to property;

    C) The degree of culpability of the regulated entity; and

    D) The existence of any additional conditions or factors in aggravation or mitigation of the violation, including information provided by the regulated entity.

7) Upon completion of the review, the Director shall issue a final Director's decision to:

    A) Affirm the violation;

    B) Vacate the violation;

    C) Amend or modify the type of violation and abatement requirements specified in the violation;

    D) Establish probationary or permanent modification or conditions to any underlying permit related to the violation, which may include special monitoring or reporting requirements; or

    E) Enter into a settlement agreement to extend the amount of time provided to complete remedial actions necessary to abate the violations or reduce the amount of the requested assessed civil penalty.

8) The final Director's decision shall be delivered to the regulated entity, or the Regulated entity's representative, as reported on Commission Organization Report, via first class mail. The final Director's decision may be appealed to the Commission by filing an application in accordance with General Rule A-2, A-3,

and other applicable hearing procedures. The Director must receive the application to appeal the final Director's decision within thirty (30) days of the mailing of the final Director's decision. The application shall state the reason for the appeal and the application shall be scheduled to be heard by the Commission in accordance with General Rule A-2, A-3, and other applicable hearing procedures.

9)  A Notice of Violation for which a Director's review has not been requested shall become a final administrative decision of the Commission thirty (30) days following the mailing of the Notice of Violation.

10) A final Director's decision not appealed to the Commission within thirty (30) days of the mailing of the final Director's decision shall become a final administrative decision of the Commission.

11) All violations specified in a Notice of Violation which have become a final administrative decision in accordance with subparagraph c) 9), included in a final Director's decision which has become a final administrative decision of the Commission in accordance with subparagraph e) 10), or included in an order of the Commission, shall be fully abated within the time frame specified in the original Notice of Violation, final Director's decision, or order of the Commission. No further permits or authorization shall be issued to the regulated entity until all outstanding violations specified in a Notice of Violation which has become a final administrative decision in accordance with subparagraph c) 9), a final Director's decision which has become a final administrative decision of the Commission in accordance with subparagraph c) 10), or by order of the Commission have been fully abated.

d)  In addition to the issuance of a Notice of Violation, the Director and the Commission may initiate investigative or enforcement proceedings upon receipt of a complaint by:

1)  Initiating a referral to the Attorney General for enforcement in accordance with Ark. Code Ann. § 14-1-606;

2)  Making reasonable investigations and inspections;

3)  Examining properties, leases, papers, books, and records;

4)  Holding hearings;

5)  Requiring the keeping of records and the making of reports;

6)  Taking such action as may be reasonably necessary to enforce state law and Commission rules, including compliance with Ark. Code Ann. §§ 14-1-601 *et seq.* and 23-119-101 *et seq.*

e)   Civil Penalties

    1)   The Director shall determine whether to request the assessment of civil penalties based on failure to comply with the applicable abatement requirements for violations issued under subparagraphs (e) (2), (3), and (4) below. If a civil penalty is requested by the Director, the regulated entity may voluntarily agree to the assessment and pay the civil penalty as requested or modified by the Director, or the Director or his designee may file an application, in accordance with General Rule A-2, A-3, and other applicable hearing procedures, to request the issuance of the requested civil penalty by the Commission. The maximum amount of the Director's requested civil penalty shall be computed as provided in subparagraphs (e) (2), (3), and (4) below. However, the Commission is not bound by the Director's request, or the amounts provided below, and may impose civil penalties of up to five thousand dollars ($5,000.00) per day per violation as permitted by statute.

    2)   Administrative violations are defined as failure to file required reports and forms and to provide required notices. The Director may request the assessment of up to two thousand five hundred ($2,500.00) dollars per administrative violation, plus up to five hundred dollars ($500.00) per day for each day the violation remains unabated after the specified compliance date. The per-administrative-violation civil penalty request shall be calculated as follows:

        A)   No previous violation of the same rule: one thousand dollars ($1,000.00). One previous violation of the same rule: one thousand five hundred dollars ($1,500.00). Two or more previous violations of the same rule: two thousand five hundred dollars ($2,500.00).

        B)   The time frame used for determining previous violations shall be limited to the regulated entity's violation record for the preceding five (5) full calendar years before the issuance of the violation.

    3)   Operating violations are defined as failure to maintain compliance with Commission digital asset mining rules. These violations include, but are not limited to, regulated activities such as operating a mining facility without the proper permit or transfer of ownership and failure to maintain a mining facility in compliance with these rules. The Director may request the assessment of up to five thousand dollars ($5,000.00) per operating violation plus up to two thousand five hundred dollars ($2,500.00) per day for each day the violation remains unabated after the specified compliance date, with the exception that operating violations as specified in statute are limited to a maximum of five thousand dollars ($5,000.00) per day per operating violation. The per-operating-violation civil penalty shall be calculated as follows:

A)    No previous violation of the same rule: two thousand five hundred dollars ($2,500.00). One previous violation of the same rule: five thousand dollars ($5,000.00).

B)    The time frame used for determining previous violations shall be limited to the regulated entity's violation record for the preceding five (5) full calendar years before the issuance of the violation.

f)    All civil penalties assessed and paid to the Commission in accordance with this subpart shall be deposited in the Commission operating fund.



**OIL & GAS COMMISSION**

Submit Form To:
El Dorado Regional Office
P.O. Box 11510
El Dorado, Arkansas 71730

# Form 42
## Digital Asset Mining Facility Permit Application
### (In accordance with 15 CAR § 275-901 thru 904 (Rule K-1))

**A.**  Purpose of filing:  ☑ Original    ☐ Amendment    ☐ Renewal

**B.**  Operator Name: _____

Address to send permit to: _____

City:_____ State:_____ Zip:_____

Phone: _____ Fax: _____ Email: _____

List name, address, and phone numbers of personnel responsible for Digital Asset Mining operations:

_____

_____

_____

**C.**  Digital Asset Mining facility name: _____  If existing, give permit no. : _____

Physical address: _____

City/Town: _____ County: _____ Zip Code: _____

Lat. & Lon. (dd.dddddd): _____

**D.**  **Please attach the following required documentation:**

1.  A survey plat of the property boundaries on which the mining facility will be located, showing the mining facility and locations of all utility services providing service to the mining facility

2.  A current topographic map, aerial, satellite imagery, or other type, showing the location of the mining facility and the distance of all surrounding residences within a two (2) mile radius of the mining facility

3.  A copy of an agreement with the entity supplying electrical power to the mining facility certifying the electric usage will not negatively impact the local electric grid or increase electric costs of local customers

4.  A copy of an agreement with the local water utility supplying water to the mining facility certifying the water usage will not negatively impact the local water supply or increase water rates of local customers

5.  A notarized affidavit certifying that the digital asset mining business operating the mining facility is not a prohibited foreign-party-controlled business

6.  A technical description, including schematics and engineering specifications of the system proposed to be utilized OR the local government location approvals necessary to comply with noise-reduction techniques in accordance with Ark. Code Ann. § 14-1-604(b)(3), that demonstrate:

    A.  The digital asset mining business will use a liquid cooling or submerged cooling process for the mining facility; OR

    B.  The mining facility will be fully enclosed around all sides, including above and below the equipment producing the noise, with material that is reasonably calculated by industry standards to reduce noise emissions to a level that is acceptable to a reasonable person under similar circumstances; OR

    C.  Upon approval by the local government, the mining facility will use a passively cooled pre-manufactured container without additionally enclosing the container in a complete envelope and the mining facility is located or relates to an area that is:

        a.  At least two thousand (2000) feet away from the nearest residential or commercial use structure; or
        b.  Zoned for industrial use or an otherwise approved use.

**E.**  **Additional Requirements:**

1.  Provide an affidavit or proof of publication providing general public notice of the application in a newspaper having a general circulation in the county(s) within a one (1) mile radius from the proposed mining facility at least ten (10) days prior to filing the application

2.  Provide notice and proof of mailing and delivery via certified mail, FedEx, UPS, or other method, at least ten (10) days prior to filing the application, to the following persons and entities:

    A.  Any local government having jurisdiction over the area where the mining facility is proposed to be located;
    B.  The Division of Environmental Quality;
    C.  All surface owners of record within one (1) mile of the mining facility; and
    D.  Any other persons as determined by the Director of the Commission.

## CERTIFICATE
I declare the information and attachments provided have been examined by me and to the best of my knowledge are true, correct and complete.

_____          _____
Signiture                                                    Date

_____
Print Name

Issued: _____ Expires: _____ Permit No.: _____

Revised 2/25

**EXHIBIT
6**

**INSTRUCTIONS**

1. Form 42 is required for operating a digital asset mining business in accordance with 15 CAR § 275-901 thru 904 (Rule K-1).

2. Complete Form 42 in its entirety.

3. Attach all required documentation in section D & E with this form.

4. Sign and date by an authorized representative.

5. Submit the Form 42 application and all attachments to the El Dorado Regional Office by mail or hand delivery.